# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2781

_____

| | | |
|---|---|---|
| Sandy Krout, individually and as Administratrix of the Estate of Bobby Joe Rylee, deceased, and survivors other, | * * * * * | |
| | * | |
| Plaintiff/Appellee, | * * | |
| v. | * * | |
| Lee Goemmer, individually, Police Officer for the City of Russellville; Bobby Stevens, individually, Police Officer for the City of Russellville; Keith Spears, individually, Police Officer for the City of Russellville; Terry Cobb, individually, Police Officer for the City of Russellville; Todd Winesburg, individually, Police Officer for the City of Russellville, | * * * * * * * * * * * | Appeals from the United States District Court for the Eastern District of Arkansas. |
| | * | |
| Defendants, | * | |
| | * | |
| Luke Sawdy, individually, Supervisor of Jail for Pope County; Chris Ketcherside, individually, Correctional Officer for Pope County, Arkansas; Chris Johnston, individually, Correctional Officer for Pope County, Arkansas; Kevin Hill, individually, | * * * * * * * | |

Correctional Officer for Pope County,          *
Arkansas,                                       *
                                                *
            Defendants/Appellants.              *
                                                *
                                                *
            _____                         *
                                                *
            No. 08-2815                          *
            _____                         *
                                                *
Sandy Krout, individually and as                *
Administratrix of the Estate of Bobby           *
Joe Rylee, deceased, and survivors              *
other,                                          *
                                                *
            Plaintiff/Appellee,                 *
                                                *
      v.                                         *
                                                *
Lee Goemmer, individually, Police               *
Officer for the City of Russellville;           *
Bobby Stevens, individually, Police             *
Officer for the City of Russellville;           *
Keith Spears, individually, Police              *
Officer for the City of Russellville;           *
Terry Cobb, individually, Police                *
Officer for the City of Russellville;           *
Todd Winesburg, individually, Police            *
Officer for the City of Russellville,           *
                                                *
            Defendants/Appellants,              *
                                                *
Luke Sawdy, individually, Supervisor            *
of Jail for Pope County; Chris                  *
Ketcherside, individually, Correctional         *
Officer for Pope County, Arkansas;              *
Chris Johnston, individually,                   *

-2-

Correctional Officer for Pope County,    *
Arkansas; Kevin Hill, individually,    *
Correctional Officer for Pope County,    *
Arkansas,    *
   *
      Defendants.    *

_____

Submitted: April 15, 2009
Filed: October 6, 2009

_____

Before LOKEN, Chief Judge, COLLOTON, Circuit Judge, and ROSENBAUM,[1] District Judge.

_____

COLLOTON, Circuit Judge.

Bobby Joe Rylee died after an altercation with police officers in Russellville, Arkansas, and a period of detention in the Pope County Detention Center. Sandy Krout, individually and as administratrix of Rylee's estate, brought an action under 42 U.S.C. § 1983 against five Russellville police officers and four Pope County correctional officers in their individual capacities. She alleged that the police officers used excessive force against Rylee, in violation of the Fourth Amendment, and that the correctional officers deprived him of adequate medical care, in violation of the Due Process Clause of the Fourteenth Amendment. The defendants moved for summary judgment based on qualified immunity, and the district court denied the motions. All nine defendants appeal. We dismiss in part for lack of jurisdiction, affirm in part, and reverse in part.

_____

[1]The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota, sitting by designation.

-3-

I.

Viewed in the light most favorable to Krout, the relevant facts are as follows. At around 1:20 a.m. on July 15, 2006, in Russellville, Arkansas, Sarah Lowrey walked into a gas station and asked the clerk to call the police. She said that she was driving around in a truck with a man named Bobby Joe Rylee, and that although Rylee had not threatened her, he was agitated, needed sleep, and had a knife. Lowrey returned to the truck and Rylee continued driving. In the meantime, the clerk called 911, and a police dispatcher issued a broadcast to local law enforcement concerning the situation. Lee Goemmer, an officer of the Russellville Police Department ("RPD") who was driving nearby, heard the broadcast and observed a truck that matched the dispatcher's description cross the center line. Goemmer signaled for the truck to pull over. Rylee, who was driving the truck, drove into the parking lot of an Exxon gas station, which was adjacent to a Waffle House restaurant. Goemmer followed behind, parked his patrol car, and ran toward Rylee's truck.

As Goemmer approached, Rylee began reversing his truck. Goemmer yelled at him to stop, saying that Rylee was going to back into the patrol car. Rylee eventually stopped, at which point Goemmer instructed him to exit the truck. Rylee did not get out, so Goemmer attempted to arrest him. As Goemmer tried to gain control of Rylee's left hand, a scuffle ensued. Officer Bobby Stevens of the RPD arrived on the scene shortly thereafter and ran toward Rylee and Goemmer, yelling at Rylee to get on the ground. After Goemmer attempted unsuccessfully to pull Rylee out of the truck, Stevens performed a "hip toss" maneuver, causing Rylee, Goemmer, and Stevens to fall to the pavement at the same time. Goemmer and Stevens remained on the ground with Rylee, attempting to gain control of his hands.

After the hip toss, RPD Officer Keith Spears arrived on the scene, followed seconds later by another RPD officer, Terry Cobb. Arkansas Tech security officer Greg McCuin and RPD Officer Todd Winesburg arrived thereafter.

-4-

Once Rylee was on the ground and no longer resisting, several patrons and employees of the Waffle House witnessed two officers assault him. Harriet Stone witnessed one officer knee Rylee in the lower back four to six times while he was not moving, and saw another officer punch Rylee five or six times in the mid-back area. Jeff Munhall saw one officer knee Rylee in the back while a second officer punched him in the head area – again while Rylee did not move or resist. At one point, Munhall saw the officer who was kneeing Rylee walk away, only to return moments later and continue kicking and hitting Rylee. Darlene Shoptaw, another Waffle House witness, saw one officer drop down on Rylee three or four times with his knees from a standing position, while the other officer struck him with his fist near the head area. She also saw "several" other police officers standing around, not doing or saying anything to stop the officers who were assaulting Rylee. Like Shoptaw, Crystal Jones saw one officer punch Rylee in the back while a second officer fell on him with his knees from a standing position "at least three or four times." According to Jones, "between six and eight" total officers were there while the knee drops occurred.

The altercation lasted for five minutes. When it ended, Spears and McCuin lifted Rylee under his arms, dragged him to Cobb's patrol car, and placed him in the back seat. While he was dragged, Rylee was totally limp, with his head dangling and his feet not moving. Winesburg opened the rear driver's side door of Cobb's patrol car and pulled Rylee into the vehicle. Cobb then transported Rylee to the Pope County Detention Center.

They arrived at the detention center shortly before 2 a.m. Upon their arrival, Cobb removed Rylee from the patrol car and deposited him face down on the floor of the entryway, also known as the sally port. Cobb left Rylee in the custody of two correctional officers, Chris Ketcherside and Kevin Hill. Hill and Ketcherside offered to lift Rylee up, but Rylee said that he could not stand up, that his back and legs were broken, and that he could not feel his legs. They then picked him up and pulled him into the booking area. As they transported Rylee inside, they noticed a cut on his right

-5-

eye, a bump on his face, and some blood in his right ear. Neither officer smelled alcohol, but Hill thought Rylee was on drugs.

Luke Sawdy, the supervisor for the midnight to 8 a.m. shift, was in the booking area when Rylee was brought inside. Rylee stated that he could not stand up, and that he thought his legs were broken. Sawdy briefly looked at Rylee from ten feet away and thought he was drunk and uncooperative for refusing to stand up. Without asking Rylee any questions or meaningfully examining him, Sawdy instructed Hill and Ketcherside to put Rylee in an isolation cell, and to check on him every fifteen minutes. Hill and Ketcherside took Rylee to the cell, removed his handcuffs, and left him lying on the floor on his stomach. Rylee stated that his back was hurting, but when Ketcherside asked him if he wanted to see a doctor, Rylee said no.

Fifteen minutes later, per Sawdy's orders, Ketcherside returned to the cell to check on Rylee, who was still lying in the same position. Ketcherside asked him how he was feeling, and Rylee responded that he was doing fine. Ketcherside returned fifteen minutes later and again saw Rylee in the same position. Ketcherside asked Rylee if he was feeling better, and Rylee said that his arms were improving. Ketcherside continued to check on Rylee every fifteen minutes afterward, each time noticing that he was lying in the same position in which he was placed initially – a fact which he relayed to Sawdy.

At approximately 3 a.m., RPD Officer Spears arrived at the detention center to take photographs of Rylee. Spears asked Rylee if he needed any medical treatment or if he wanted to go to the hospital, and Rylee said no. Once Spears finished photographing Rylee, Spears suggested to Sawdy that Rylee be examined by emergency medical services ("EMS") personnel, who were located in the same complex as the detention center. At around 4 a.m., Rylee was placed in a wheelchair and brought from the isolation cell to the booking area for observation. He sat in a slumped position in the wheelchair, with his head down.

-6-

A short time later, EMS technicians Richard Haley and Chris Vick arrived. They examined Rylee in the booking area where he was seated, and noticed an abrasion and some bruising on his face, as well as a small amount of dried blood around his right ear. Rylee stated that his neck hurt, but Haley did not notice anything unusual about his neck other than some minor tenderness, and did not find any abnormalities in his neuromuscular function. Haley asked Rylee twice if he wanted to go to a hospital, but Rylee refused, stating that he was not the one who had requested medical attention. At around 4:50 a.m., Haley and Vick left the detention center.

At approximately 5:30 a.m., Rylee, who remained slumped in the wheelchair in the booking area, asked for help to lift his head, saying that he could not do so by himself. Michael Floyd, a correctional officer who is not a party to this lawsuit, helped Rylee reposition his neck three times so he could breathe more easily. As Floyd repositioned his neck, he asked Rylee if he needed help, but Rylee said no.

At around 7:15 a.m., Sawdy noticed that Rylee was having difficulty breathing, so he asked Ketcherside to help him reposition Rylee's neck. Because Rylee could not hold his neck up on his own, Sawdy and Ketcherside shifted his body in the wheelchair to prop up his head. This appeared to ease Rylee's breathing. At 8 a.m., the shift ended, and Sawdy, Hill, and Ketcherside left the detention center. Before departing, they noticed that Rylee was conscious and breathing. Chris Johnston, another correctional officer, came on duty at 8 a.m. He was informed that there had been an altercation between police and Rylee, that EMS personnel had examined Rylee, and that Rylee did not want to go to the hospital. Johnston saw Rylee slumped in the wheelchair, noticed that he was breathing, and assumed that he was passed out or sleeping. About twenty minutes later, as Johnston made his way to the property room, he again saw Rylee breathing.

Just after 8:30 a.m., however, a corporal on duty yelled out to call 911 because Rylee was not breathing. Johnston called EMS, and during the call, the EMS dispatcher asked Johnston several times if anybody at the detention center wanted to perform cardiopulmonary resuscitation ("CPR"), and offered to guide officers through the process. Johnston relayed the question to the corporal, but the corporal was afraid that no staff member was trained in CPR. Thus, Johnston and the staff at the detention center waited for EMS personnel to arrive.

EMS technicians Pam Logan and Haley, the same technician who previously had examined Rylee, initiated CPR on Rylee at 8:35 a.m., just under five minutes after he was found not breathing by the corporal. When Logan and Haley arrived, Rylee had no pulse and was in the last stages of cardiopulmonary arrest. Logan and Haley continued CPR, restored Rylee's pulse at approximately 8:49 a.m., and transported him to the hospital. Rylee never regained consciousness, and he died five days later. The cause of death was multiple blunt force injuries with complications; the principal factor was a neck fracture and spinal cord injury.

Krout brought an action under 42 U.S.C. § 1983 against RPD officers Goemmer, Stevens, Spears, Cobb, and Winesburg, and Pope County correctional officers Sawdy, Hill, Ketcherside, and Johnston, all in their individual capacities.[2] She alleged that the RPD officers used excessive force against Rylee or permitted others to use excessive force against him. She also alleged that the correctional officers deprived Rylee of adequate medical care when they knew or should have known that he was in critical condition at the detention center.

---

[2]Krout also sued these nine defendants in their official capacities, as well as the City of Russellville and its police chief, Pope County and its sheriff, and Greg McCuin, who was later dismissed from the case by stipulation of the parties. In addition to her claims under § 1983, Krout brought claims for wrongful death and violations of the Arkansas Civil Rights Act. Ark. Code Ann. § 16-123-101 *et seq.* None of these claims is at issue in this appeal.

All nine officers filed motions for summary judgment, but the district court concluded that none was entitled to qualified immunity, and denied the motions. The district court analyzed Krout's excessive force claim under the Fourth Amendment. The court determined that genuine issues of material fact remained regarding who was involved, to what extent they used force, and whether the hip toss or subsequent actions taken by the officers caused Rylee's death. The court assessed Krout's denial-of-medical-care claim under the Eighth Amendment's "deliberate indifference" standard. The court concluded that questions of fact remained regarding Rylee's condition upon entry at the detention center, the extent of the officers' medical screening, and the appropriateness of the officers' further conduct. These and other questions, the court determined, precluded a grant of summary judgment on the basis of qualified immunity.

## II.

Ordinarily, we have no jurisdiction to hear an immediate appeal from a district court's order denying summary judgment, because such an order is not a final decision. *See* 28 U.S.C. § 1291; *Crow v. Montgomery*, 403 F.3d 598, 601 (8th Cir. 2001). We do have limited authority, however, to review the denial of qualified immunity through an interlocutory appeal under the collateral order doctrine. *Johnson v. Jones*, 515 U.S. 304, 311-12 (1995). Our jurisdiction in such cases extends only to "abstract issues of law," *id.* at 317, not to "determination[s] that the evidence is sufficient to permit a particular finding of fact after trial." *Id.* at 314. Thus, "a defendant entitled to invoke a qualified immunity defense may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Id.* at 319-20. In this case, the district court identified few genuinely disputed facts in its order denying qualified immunity. Accordingly, to resolve some aspects of the appeals, we must "undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." *Id.* at 319.

Qualified immunity shields a government official from liability when his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether the defendants are entitled to qualified immunity, we ask (1) whether the facts alleged or shown, construed in the light most favorable to Krout, establish a violation of a constitutional or statutory right, and (2) whether that constitutional right was clearly established as of July 2006, such that a reasonable official would have known that his actions were unlawful. *See Pearson v. Callahan*, 129 S. Ct. 808, 815-16 (2009); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson*, 129 S. Ct. at 818. Unless the answer to both of these questions is yes, the defendants are entitled to qualified immunity. We review a district court's qualified immunity determination on summary judgment *de novo*, viewing the record in the light most favorable to Krout and drawing all reasonable inferences in her favor. *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009).

III.

A.

We consider first the claims of the RPD officers, starting with Goemmer and Stevens. Their sole argument on appeal is that Rylee's death was caused by the hip toss, and not by any of the punches or blows allegedly administered by Goemmer and Stevens after Rylee was on the ground. They further contend that the hip toss was an objectively reasonable use of force under the Fourth Amendment, and that they are entitled to qualified immunity on that basis.

The district court ruled that genuine issues of material fact remained as to "what caused Rylee's death – the hip-toss maneuver or subsequent actions of the City officers." In *Miller v. Schoenen*, 75 F.3d 1305 (8th Cir. 1996), this court explained

-10-

that if the issues raised on appeal "relate to whether the actor actually committed the act of which he is accused, or damages, *or causation*, or other similar matters that the plaintiff must prove, we have no jurisdiction to review them in an interlocutory appeal of a denial of a summary-judgment motion based on qualified immunity." *Id*. at 1309 (emphasis added). In *Pool v. Sebastian County*, 418 F.3d 934 (8th Cir. 2005), we dismissed for lack of jurisdiction that portion of a qualified immunity appeal in which the defendants argued that there was "no proof that they proximately caused any compensatory damages." *Id*. at 943. In view of these authorities, which apply the Supreme Court's direction in *Johnson v. Jones*, we lack jurisdiction to review the contention of Goemmer and Stevens that there is insufficient evidence of causation to hold them liable for Rylee's death.

B.

The next three officers, Spears, Cobb, and Winesburg, argue that only two officers allegedly struck Rylee after he was taken to the ground, and there is no evidence that any of them ever administered force against him. Our review of the record discloses one witness who averred that "two or three" officers participated in striking Rylee, although the identity of the officers involved is not clear. We need not resolve whether Spears, Cobb, and Winesburg should remain in the lawsuit based solely on allegations of striking Rylee. Krout advances an alternative theory that these officers violated Rylee's Fourth Amendment rights by failing to intervene to stop the allegedly unconstitutional use of force. On this point, we conclude that the record supports the district court's denial of qualified immunity for Spears, Cobb, and Winesburg.[3]

_____

[3]Spears, Cobb, and Winesburg urge that Krout did not raise a failure-to-intervene claim in the district court, but Krout alleged in her amended complaint that RPD officers, including these three, "permitted and encouraged other defendant officers to use . . . excessive force" in the arrest of Rylee. In addition, Krout argued in her opposition to the motions for summary judgment that "th[e] officers who did

-11-

As of July 2006, it was clearly established that a state actor may be liable for an unreasonable seizure under the Fourth Amendment if he fails to intervene to prevent the unconstitutional use of excessive force by another official. In *Putnam v. Gerloff*, 639 F.2d 415 (8th Cir. 1981), this court held that a prison guard could be liable under § 1983 if he was present and saw another correctional officer hit an inmate several times with a gun, but did nothing to stop the assault. *Id.* at 423. The court quoted *Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972), for the proposition that "one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge." *Id.* at 11. This duty of a police officer to intervene to prevent the excessive use of force – where the officer is aware of the abuse and the duration of the episode is sufficient to permit an inference of tacit collaboration – was also recognized in numerous appellate decisions as of 2006, without any serious dispute from other quarters. *See Torres-Rivera v. O'Neill-Cancel*, 406 F.3d 43, 51-52 (1st Cir. 2005); *Priester v. City of Riviera Beach*, 208 F.3d 919, 924-25 (11th Cir. 2000); *Ensley v. Soper*, 142 F.3d 1407, 1407 (11th Cir. 1998); *Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996); *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 207 n.3 (1st Cir. 1990) (per curiam); *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988); *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982) (per curiam). Other decisions from this circuit have applied the general proposition in various contexts. *See Williams v. Mueller*, 13 F.3d 1214, 1216 (8th Cir. 1994); *Buckner v. Hollins*, 983 F.2d 119, 122 (8th Cir. 1993); *Arnold v. Jones*, 891 F.2d 1370, 1372-74 (8th Cir. 1989); *Webb v. Hiykel*, 713 F.2d 405, 408 (8th Cir. 1983).

Taking the facts in the light most favorable to Krout, the evidence supports a finding that Spears, Cobb, and Winesburg violated Rylee's clearly established rights under the Fourth Amendment by failing to intervene when they had a duty and

not strike Rylee *stood idly by and did nothing to stop the assault and failed to intervene on his behalf.*" (R. Doc. 81, at 4) (emphasis added).

-12-

opportunity to do so. There is a submissible case that other officers used excessive force against Rylee. Waffle House witnesses testified that while Rylee was on the ground – handcuffed, and no longer resisting – two officers kicked and punched him several times. According to Shoptaw and Jones, one officer forcefully dropped down on Rylee's back from a standing position three or four times, while a second officer punched him in the back or head area with his fist. According to Stone, one officer kneed him in the lower back four to six times while another officer punched him five or six times in the mid-back area. And according to Munhall, one officer kneed him in the back while a second officer punched him in the head area. It was clearly established that the use of this type of gratuitous force against a suspect who is handcuffed, not resisting, and fully subdued is objectively unreasonable under the Fourth Amendment. *See Henderson v. Munn*, 439 F.3d 497, 502-03 (8th Cir. 2006); *Phelps v. Coy*, 286 F.3d 295, 301-02 (6th Cir. 2002).

There is also evidence from which a jury could find that Spears, Cobb, and Winesburg observed this use of excessive force and had an adequate opportunity to intervene and stop it, but unreasonably failed to do so. While Rylee was punched and kicked, Jones recalled seeing "between six and eight" officers at the scene, and Shoptaw observed "several" officers standing around, not saying or doing anything to stop the attack. All three officers admit that they were on the scene at various times during the incident, and a reasonable jury could thus conclude that they were among the "six to eight" or "several" officers who were observed by the witnesses.

Shoptaw testfied that the assault lasted for a "good five minutes," a period which a jury could find sufficient to afford the onlooking officers an opportunity to intervene. The assault lasted for at least as long as it took Munhall, who observed the two officers kicking and punching Rylee from inside the restaurant, to conclude that the officers were going "overboard," to run outside to try to "get some badge numbers," and to continue watching until the assault stopped. There was sufficient time for Shoptaw, who was seated at a booth inside, to learn from a friend that a fight

-13-

was ongoing, to turn around to see the two officers kneeing and punching Rylee, to stand up from the booth, and to sit back down after determining that she had a better view from the booth.  Based on these facts, a jury reasonably could find that Spears, Cobb, and Winesburg violated Rylee's clearly established rights by failing to intervene and stop the ongoing assault.  Accordingly, they are not entitled to qualified immunity on Krout's Fourth Amendment claim.

IV.

A.

We turn finally to the claims of the four Pope County correctional officers: Sawdy, Hill, Ketcherside, and Johnston.  They argue that even accepting the facts likely assumed by the district court regarding Rylee's medical care, they did not violate Rylee's clearly established rights under the Fourteenth Amendment.  Specifically, they claim that they did not act with deliberate indifference to a substantial risk of physical harm, because they took affirmative action in response to his medical needs.  They also contend that even if we assume sufficient evidence to establish a violation of Rylee's constitutional right, they are entitled to qualified immunity.  *Pearson*, 129 S. Ct. at 816.  We have jurisdiction to review these "abstract issue[s] of law relating to qualified immunity."  *Behrens*, 516 U.S. at 313 (quoting *Johnson*, 515 U.S. at 317).

Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's ban against cruel and unusual punishments.  *Farmer v. Brennan*, 511 U.S. 826, 828 (1994).  The Eighth Amendment does not govern the treatment of pretrial detainees like Rylee, but under the Due Process Clause of the Fourteenth Amendment, "deliberate indifference is the appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate . . .

-14-

medical care." *Hartsfield v. Colburn*, 491 F.3d 394, 396 (8th Cir. 2007) (internal quotation omitted).

To establish deliberate indifference, Krout must show that Rylee suffered from one or more objectively serious medical needs, and that the correctional officers acted with a "sufficiently culpable state of mind," *Farmer*, 511 U.S. at 834 (internal quotation omitted), namely, that they actually knew of, but deliberately disregarded, Rylee's medical needs. *Id.* at 837; *Hartsfield*, 491 F.3d at 397; *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006). Under this subjective prong, the evidence must show that the officers recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk. *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see Gregoire v. Class*, 236 F.3d 413, 418 & n.3 (8th Cir. 2000).

The showing of actual knowledge is a "question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. Thus, "a factfinder may conclude that [an officer] knew of a substantial risk from the very fact that the risk was obvious." *Id.* But "[i]t is not enough merely to find that a reasonable person would have known [about the risk], or that [the officer] should have known" about the risk. *Id.* at 843 n.8. Similarly, the obvious inadequacy of a response to a risk may support an inference that the officer recognized the inappropriateness of his conduct.

Even if Krout satisfies the subjective awareness prong, the officers "may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. It does not follow, however, that an unreasonable response – i.e., a negligent response – is sufficient to establish liability. Even if an official acts unreasonably in failing to take particular measures to improve conditions at a jail facility, for example, "reasonableness is a negligence standard," and "negligence cannot give rise" to a deliberate indifference claim. *Crow*, 403 F.3d at 602 (internal quotation omitted); *see Gregoire*, 236 F.3d at 418. In the

-15-

context of medical care, "[d]eliberate indifference may include intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed," but "a showing of deliberate indifference is greater than gross negligence and requires more than mere disagreement with treatment decisions." *Pietrafeso v. Lawrence County*, 452 F.3d 978, 983 (8th Cir. 2006) (internal quotations and brackets omitted). The plaintiff must show that the officers were deliberately indifferent in their response to the perceived risk. *See Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996) (en banc) ("We reject the suggestion that the proper measure of the duty to respond of persons with the requisite knowledge ought to revisit negligence. Under that view, negligence tossed out the front door re-enters through the back.").

## B.

Krout argues that Rylee suffered from several objectively serious medical needs. She contends that he could not walk or feel his legs, that he had abrasions on his face and ear, and that later in the morning, he had difficulties breathing and could not hold his head upright on his own. Krout asserts that notwithstanding these objectively serious medical needs, Sawdy, Hill, and Ketcherside placed Rylee in an isolation cell without assessing his condition, and failed to call medical personnel when his breathing became noticeably worse later in the morning. As for Johnston, who came on shift at 8 a.m., Krout contends that he too ignored Rylee's breathing problems, and that after Rylee was found not breathing, he declined to perform CPR, even though the EMS dispatcher offered to guide him through the process.

We assume for purposes of this appeal that Rylee's inability to walk or feel his legs, as well as his difficulty breathing as the morning progressed, constitute objectively serious medical needs. The entitlement of the officers to qualified immunity thus turns on whether they knew of the serious medical need and were

-16-

deliberately indifferent to it. As *Miller* explained in the related context of risk of assault, we have jurisdiction to consider that question:

> By way of example, whether an inmate has alleged sufficient facts to allow a jury to conclude that the inmate faces a risk of assault from other inmates, prison officials know of the risk, and the reasonableness of their actions in light of a known risk are all reviewable in an appeal of a denial of qualified immunity at the summary-judgment stage. That much is so because prison officials must protect inmates from violence at the hands of other inmates, if they are aware of a substantial risk that such violence will occur. That is the 'clearly established' law. *Examination of facts known to the prison officials is necessary in order to determine whether a reasonable official would have known that his failure to take some particular action to protect the inmate would violate that law*.

75 F.3d at 1308 (emphasis added). We assess the record during two periods of time, the first encompassing the period before arrival of the EMS technicians, and the second spanning the period after the EMS personnel departed until Rylee was found not breathing.

When Riley arrived at the detention center, he stated to Sawdy, Hill, and Ketcherside that his back and legs were broken, and that he could not feel his legs. He also had abrasions on his face and blood in his right ear, and he had to be transported by Hill and Ketcherside from the sally port to the booking area, and then to the isolation cell. While Rylee was in the isolation cell, Ketcherside saw (and Sawdy was informed) that he remained on his stomach in the same position in which he had been placed initially, moving only his arms. Given these facts, Sawdy, Hill, and Ketcherside recognized substantial risks to Riley's health.

The record does not establish, however, that they were deliberately indifferent to those risks. Although all three officers were aware that Sawdy had not meaningfully assessed Rylee, they knew that Rylee was under close observation, with

-17-

officers checking him every fifteen minutes as Sawdy had ordered. Hill and Ketcherside also knew from the time they put Rylee in the cell that he did not want medical attention. When Ketcherside returned to make his periodic check, he asked Rylee if he was feeling better, and Rylee stated that he was doing fine. When RPD Officer Spears came to photograph Rylee around 3 a.m. and asked if he wanted medical attention, Rylee said no, a fact of which both Hill and Ketcherside were aware. Around 4 a.m., all three officers knew that Rylee had been transported to the booking area for closer observation, and Sawdy called EMS at Spears's suggestion. When EMS technicians Haley and Vick arrived, Haley examined Rylee's neck and neuromuscular function, determined that there was nothing unusual or abnormal about his condition, and left the detention center with Vick. During the examination, Rylee again refused to go to the hospital.

This evidence does not support a finding that Sawdy, Hill, or Ketcherside were deliberately indifferent in responding to Rylee's serious medical need. The officers did not ignore the detainee; they inquired several times whether he desired medical attention. Rylee declined to go to the hospital at least three times – once when he was placed in the cell initially, a second time when Spears came to photograph him, and a third time when asked by Haley. He also told Ketcherside during a periodic check that he was doing fine. Despite these refusals, Sawdy arranged for an examination by Haley, a trained medical technician, who concluded that there was nothing abnormal about Rylee's condition. Thus, the officers knew that Rylee did not want to go to the hospital, that he was being monitored every fifteen minutes and then observed in the booking area, that Sawdy called EMS, and that Haley reported no medical emergency. This evidence is insufficient to demonstrate that Sawdy, Hill, or Ketcherside deliberately disregarded a serious medical need of Rylee's during this period.

Krout concedes that the defendants have a "pass" from liability for deliberate indifference between the time when Haley examined Rylee (and perceived no need for treatment) and when Rylee developed breathing problems later in the morning.

She claims, however, that once the officers realized that Rylee's breathing had deteriorated significantly, they were deliberately indifferent to a serious medical need. Rylee's breathing appears to have worsened around 5:30 a.m, when he asked for help to lift up his head because he was unable to do so on his own. Around that time, Floyd repositioned Rylee's neck three times, and Sawdy and Ketcherside shifted his body in the wheelchair. These actions appeared to ease his breathing. Nonetheless, Rylee remained slumped over and with his head down for most of the later morning hours.

Although all three officers recognized that Rylee's breathing deteriorated during this period, the fact remains that Haley had concluded that Rylee's condition was not abnormal, and Rylee had declined several times to go to the hospital. There is no evidence that Sawdy, Hill, or Ketcherside subjectively questioned Haley's conclusion or otherwise had reason not to rely on it. That a trained medical technician did not appreciate the risks attendant to Rylee's condition undermines an inference that the untrained officers obviously knew that Rylee was at serious risk to stop breathing or that his neck was broken. Given what they did know, it cannot be said that the officers deliberately ignored Rylee's plight. Sawdy, Ketcherside, and Floyd assisted him in adjusting his position, and they located Rylee in the booking area for immediate observation. The record in the light most favorable to Krout at most shows negligence by Sawdy, Hill, and Ketcherside in failing to summon medical personnel for another visit when Rylee's condition appeared to deteriorate. The evidence is insufficient to demonstrate deliberate indifference, and the officers are entitled to qualified immunity.

The remaining question is whether Johnston, who arrived at the detention center at 8 a.m., deliberately disregarded Rylee's medical needs during the thirty minutes before Rylee stopped breathing. Krout argues that Johnston ignored Rylee's shallow breathing, but the information available to Johnston when he arrived on shift was that EMS personnel had examined him, and that Rylee had refused to go to the hospital.

He also knew that other officers were checking on Rylee, and he twice saw that Rylee was breathing – once at the start of the shift and a second time just before Rylee was found not breathing. Thus, even if we assume that Johnston recognized that Rylee's condition presented a serious medical need, the record does not support a finding that he knew that his actions during that thirty-minute period were inappropriate.

Johnston's failure to perform CPR also does not amount to deliberate indifference. After the EMS dispatcher asked Johnston whether he wanted to perform CPR, and offered to guide him through the process, Johnston relayed the question to his superior, who expressed concern that no one at the detention center was trained in CPR. EMS personnel are located in the same complex as the detention center, so it took EMS only four minutes to respond to the call and to begin administration of CPR. It is debatable whether Johnston's choice to await the arrival of medical personnel rather than to attempt CPR based on telephonic instruction was reasonable, but the evidence does not show that he deliberately ignored Rylee's medical condition. At most, he made an unreasonable judgment call under the circumstances, and that is insufficient to establish a constitutional violation or to defeat qualified immunity.

\*     \*     \*

For the foregoing reasons, we dismiss the appeals of Goemmer and Stevens for lack of jurisdiction, affirm the denial of qualified immunity as to Spears, Cobb, and Winesburg, and reverse the denial of qualified immunity as to Sawdy, Hill, Ketcherside, and Johnston.

———————————————

-20-