# United States Court of Appeals
### For the Eighth Circuit

_____

No. 14-1962

_____

Eva Robinson; Ron Robinson

*Plaintiffs*

Matthew Robinson

*Plaintiff - Appellee*

v.

Steven Payton, Individually and in his Official Capacity as Deputy Marshal for the City of Dover; Kristopher Stevens, Individually, and in his Official Capacity as a Sergeant for the Pope County Sheriff's Department

*Defendants*

Stewart Condley, Individually, and in his Official Capacity as a Corporal for the Arkansas State Police

*Defendant - Appellant*

Rod Pfeifer, Individually, and in his Official Capacity as the Chief Marshal of the City of Dover Marshal's Office; Aaron Duvall, Individually, and in his Official Capacity as Sheriff of Pope County; City of Dover; Dover Marshal's Office; Pope County Arkansas; Pope County Sheriff's Department; Arkansas State Police; Chris Goodman, Individually, and in his Official Capacity as a Trooper for the Arkansas State Police

*Defendants*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: January 14, 2015
Filed: June 29, 2015

_____

Before LOKEN, MURPHY, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Matthew Robinson sued Arkansas State Trooper Stewart Condley under 42 U.S.C. § 1983, alleging Trooper Condley failed to stop another law enforcement officer's use of excessive force. Trooper Condley filed a motion for summary judgment asserting qualified immunity. The district court denied the motion, holding a jury could find that Trooper Condley violated Matthew Robinson's clearly established constitutional right to be free from excessive force. Trooper Condley appeals. Because Trooper Condley's duty to intervene in the circumstances of this case was not clearly established, we reverse.

I

On September 13, 2011, Eva Robinson and her son Matthew Robinson were walking their dog in front of their home. Steven Payton, a part-time Deputy Marshal for the City of Dover Marshal's Office, observed "suspicious people walking." He saw one of the suspicious people, Matthew, throw something into the grass. He stopped Matthew and Eva on the sidewalk.[1] Suddenly, the Robinsons' dog ran away,

_____

[1] Deputy Marshal Payton later searched the area but could not find the object. The present appeal involves only the claim against Trooper Condley and does not involve the question of whether reasonable suspicion or probable cause justified the

- 2 -

and Matthew chased it. After Matthew returned with the dog, Deputy Marshal Payton placed Eva, Matthew, and their dog inside his patrol car.

While the Robinsons were inside the patrol car, Kristopher Stevens, a Deputy Sheriff for Pope County, and Stewart Condley, an Arkansas State Trooper, arrived at the scene. After Trooper Condley, Deputy Sheriff Stevens, and Deputy Marshal Payton met briefly to discuss the situation, they walked towards the patrol car. Deputy Sheriff Stevens asked Matthew to exit the patrol car. Matthew did not exit, and Deputy Sheriff Stevens tased Matthew while Matthew was in the backseat.

The parties disagree about what occurred before Deputy Sheriff Stevens tased Matthew. According to the Robinsons, Matthew was tased while he was struggling to get out of the backseat. Matthew is at least six feet tall and wears a size sixteen shoe. Eva asserts Deputy Sheriff Stevens tased Matthew without warning very shortly after asking Matthew to get out of the car. Matthew asserts that one of the officer's arms was inside the car as he was attempting to get out, and he reached for the arm for assistance to exit the vehicle. Trooper Condley asserts Matthew refused to exit the vehicle after multiple requests. Trooper Condley also alleges that Deputy Sheriff Stevens told Matthew that if Matthew did not get out of the car, Deputy Sheriff Stevens was going to tase Matthew. Because we are required to view the facts in the light most favorable to Matthew, we accept his version of the events at this stage.

While Deputy Sheriff Stevens was tasing Matthew, Eva tried to shield Matthew. In response, Trooper Condley walked around the back of the patrol car, removed Eva from the vehicle, and handcuffed her.

---

initial stop.

Deputy Marshal Payton then pulled Matthew from the car—on the opposite side of the car from Trooper Condley and Eva—and drive-stunned him at least twice while Matthew was standing. At some point, Deputy Marshal Payton took Matthew to the ground behind the patrol car and drive-stunned Matthew at least twice more. Photos of Matthew from after the altercation show at least fifteen taser marks. Deputy Marshal Payton and Deputy Sheriff Stevens placed Matthew in handcuffs and searched him. The officers found cigarette lighters and an air chuck.

Meanwhile, Trooper Condley was attempting to control Eva on the other side of the car. During this time, Trooper Condley placed Eva in handcuffs on the sidewalk next to the patrol car. Eva thought the officers were shooting her son with a handgun—she was not familiar with tasers. She urinated on herself and screamed for her husband. She wanted to cover Matthew to protect him. Eva later stated that she was willing to give her life to protect her son. Trooper Condley was holding her down so she could not go to Matthew. At one point, she broke free from the handcuffs and moved towards the other officers and Matthew. Trooper Condley grabbed her and slammed her onto the hood of the patrol car. Eva broke the patrol car's antenna with her hand in an attempt to stabilize herself. Trooper Condley is 6′3″ tall and weighs at least 200 pounds. He described Eva as "not very big" and "someone that [he] can handle pretty easily." Eva and Matthew were then placed back into the police car.[2]

Although three patrol cars were present, only one dash-cam video was produced. The video does not have audio, and a different patrol car blocks the camera for a large portion of the video. A taser stores data regarding the duration and

---

[2] We note this appeal does not involve any issues of alleged excessive force by Trooper Condley against Eva Robinson; rather, this appeal involves only Trooper Condley's duty to stop the alleged excessive force by others against Matthew Robinson.

the number of times it was used.[3]  Pope County sent the taser to the manufacturer sometime after the altercation.  The manufacturer lost or destroyed the data.

Eva was charged with disorderly conduct, refusal to submit to arrest, and criminal mischief.  Matthew was charged with refusal to submit to arrest.  The Pope County Sheriff, Aaron Duvall, investigated Deputy Sheriff Stevens's actions and decided not to take any disciplinary action.  The Marshal for the City of Dover (Rod Pfeifer) investigated Deputy Marshal Payton's actions and decided not to take any disciplinary action.

The Robinsons sued the City of Dover, the Dover Marshal's Office, Pope County, and the Pope County Sheriff's Department.  They also sued individually and officially Deputy Marshal Payton, Deputy Sheriff Stevens, Trooper Condley, Sheriff Duvall, and Marshal Pfeifer.  The Robinsons alleged violations of their federal and state constitutional rights.  They also alleged that the officers violated provisions of the Arkansas Civil Rights Act.  They sought damages for common law outrage, abuse of process, battery, and failure to supervise.

Defendants moved for summary judgment.  The district court granted some claims and denied others.  Relevant to this appeal, the district court denied Trooper Condley's motion for qualified immunity on the claim that Trooper Condley failed to intervene during the other officers' use of excessive force against Matthew.  The district court held "[t]hough it is undisputed that Condley did not use any force on Matthew, a reasonable juror could find that Condley failed to stop Deputy Sheriff Stevens from continuing to tase Matthew, although he had a duty to do so."  Trooper Condley appeals.

---

[3] In Deputy Sheriff Stevens's Incident Report, he stated that Matthew was tased only three times.  Deputy Sheriff Stevens later admitted that he tased Matthew at least six times.

II

We review the denial of summary judgment de novo, construing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in his or her favor. Schoelch v. Mitchell, 625 F.3d 1041, 1045 (8th Cir. 2010). The movant is entitled to summary judgment if the record presents no genuine dispute as to any material fact and he or she succeeds as a matter of law. Fed. R. Civ. P. 56. Because this is an interlocutory appeal from a denial of qualified immunity, appellate review is limited to the legal question of whether Condley is entitled to qualified immunity. This Court has jurisdiction to review issues of law. Craighead v. Lee, 399 F.3d 954, 960 (8th Cir. 2005).

An official is entitled to qualified immunity unless (1) the evidence, viewed in the light most favorable to the nonmoving party, establishes a violation of a federal constitutional or statutory right, and (2) the right was clearly established at the time of the violation. See Pearson v. Callahan, 555 U.S. 223, 227 (2009). We are "permitted to exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id. at 236.

In assessing whether a right is clearly established, the Supreme Court has emphasized that we must define the right "in light of the specific context of the case, not as a broad general proposition." Saucier v. Katz, 533 U.S. 194, 201 (2001). "[T]he salient question . . . is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged [conduct] was unconstitutional." Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (alterations in original) (citation and internal quotation marks omitted). As such, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Winter v. Adams, 254 F.3d 758, 766 (8th Cir. 2001) (citation omitted); see also Davis v. Hall, 375 F.3d 703, 712 (8th Cir. 2004) ("Officials are not

liable for bad guesses in gray areas; they are liable for transgressing bright lines."). Therefore, "existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate." Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014) (citation and internal quotation marks omitted).

The Eighth Circuit has held that a police officer may be liable if he does not intervene to prevent the use of excessive force when "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." Nance v. Sammis, 586 F.3d 604, 612 (8th Cir. 2009) (citation omitted).

Matthew argues Trooper Condley is not entitled to qualified immunity because case law clearly established at the time of the incident that an officer may be liable for failing to intervene to prevent the use of excessive force. Trooper Condley argues that he is entitled to qualified immunity for three reasons: first, he did not observe or have reason to know the two other officers were applying excessive force to Matthew; second, he did not have a duty to intervene because he did not have the opportunity and means to do so; and third, the duty to intervene in the specific circumstances of this case—i.e., when occupied with another person on the scene—was not clearly established.

Viewing the evidence in the light most favorable to Matthew and drawing all reasonable inferences in his favor, we cannot say Trooper Condley's duty to intervene was clearly established in the specific context of this case. Because Trooper Condley's conduct was arguably reasonable in light of the circumstances, he is entitled to qualified immunity as a matter of law. Eva was under the impression that the officers shot Matthew because she thought the taser was a handgun. She was hysterical and unpredictable while Trooper Condley removed her from the car and attempted to control her. She stated she was willing to give her life to protect Matthew. In addition to urinating on herself, she was screaming for her husband and

- 7 -

attempting to join the altercation between Matthew and the other officers. Eva could see the other officers "smushing" Matthew's face into the gravel. Eva was screaming continuously as Trooper Condley was holding her down and not allowing her to get up. Eva stated that she tried to stand up, and "if I could have stood up and been free, I would have gone to Matthew."

At one point, Eva broke free from the handcuffs and moved towards the other officers and Matthew. Trooper Condley grabbed her and stopped her from joining the altercation. Trooper Condley slammed Eva onto the front of the squad car and placed her in handcuffs for the second time. At this point, Eva thought the officers were going to kill her in addition to Matthew. After Trooper Condley restrained her for the second time, he placed her into the back seat of Deputy Marshal Payton's squad car.

The Supreme Court does not permit courts to define clearly established law at high levels of generality; the analysis must take into account the specific facts of each case. Plumhoff, 134 S. Ct. at 2023. The "crucial question is whether the official acted reasonably in the particular circumstances that he or she faced." Id. We find that a reasonable official, standing in Trooper Condley's shoes, would not understand that what he is doing—restraining a hysterical individual on the scene and deciding not to leave the hysterical individual and intervene—violates clearly established law. Trooper Condley neither was plainly incompetent nor did he knowingly violate the law. His decision to stay with Eva and not to intervene did not transgress a bright line. If he left Eva, she could have and likely would have joined the altercation, possibly harming herself or others.[4]

---

[4] The dissent indicates that questions remain about whether the repeated tasing which caused Matthew's injuries were justified. We agree. Our opinion does not address, and certainly does not decide, whether Matthew's rights were violated by the repeated tasings. Rather, taking the evidence in the light most favorable to the plaintiffs, and in particular crediting the plaintiffs' own statements, we conclude that

Matthew's reliance on <u>Nance v. Simmons</u> and <u>Krout v. Goemmer</u> is unpersuasive. In both cases, officers failed to intervene. In those cases, however, the officers were not occupied with another individual on the scene—let alone one who was hysterical. <u>See</u> <u>Nance</u>, 586 F.3d at 611–12; <u>Krout v. Goemmer</u>, 583 F.3d 557, 566 (8th Cir. 2009) (noting a witness stated several officers were standing around and watching other officers apply excessive force). Here, Trooper Condley was engaged with a volatile individual. Neither <u>Nance</u> nor <u>Krout</u> put Trooper Condley on notice that his actions violated clearly established law.

III

Because we do not find it would be clear to a reasonable officer, standing in the shoes of Trooper Condley, that his conduct was unlawful in the present case, Trooper Condley is entitled to qualified immunity. The district court's denial of qualified immunity is reversed.

MURPHY, Circuit Judge, dissenting.

I respectfully dissent. Chief Judge Brian Miller's denial of qualified immunity to Corporal Condley should be affirmed because disputed issues of material fact remain. These include whether Condley breached a duty to intervene while other officers subjected Matthew Robinson to repeated and injurious taser shocks. The record reveals that Matthew was tased 22 times and contains photographs of his injuries which included wounds and scars on his face, chest, abdomen, and back, as well as a pilonidal cyst on his anus. No drugs were ever found.

---

a third-party officer did not violate clearly established constitutional principles by restraining the victim's mother, who by her own admission was hysterical, and preventing a possible further escalation of a volatile situation.

Questions remain about whether the repeated tasings which caused Matthew's injuries were justified. He was first tased while detained in the backseat of a patrol car, with little potential to break away. Cf. Lawyer v. City of Council Bluffs, 361 F.3d 1099, 1105 (8th Cir. 2004). Whether Matthew's failure or inability to exit the car immediately on Stevens' order should have been interpreted as a "threat to his personal safety or whether it constituted nothing more than an affront to his command authority is a matter for a jury to decide." Brown v. City of Golden Valley, 574 F.3d 491, 497 (8th Cir. 2009). Moreover, Matthew's size may have prevented him from easily climbing out.

Metal probes fired by a taser can penetrate up to half an inch into the skin of a subject and deliver a 50,000 volt shock lasting up to five seconds. McKenney v. Harrison, 635 F.3d 354, 362 (8th Cir. 2011) (Murphy, J., concurring). Tasers intrude upon a subject's "physical integrity in a way that other non-lethal uses of force do not," Bryan v. MacPherson, 630 F.3d 805, 825 (9th Cir. 2010), and they must be used prudently and in justifiable circumstances, see McKenney, 635 F.3d at 364 (Murphy, J., concurring). Recent examples continue to show that imprudent use of tasers by law enforcement may cause permanent injury and even death. See Alan Blinder, Use of Tasers Is Scrutinized After Walter Scott Shooting, N.Y. Times, May 31, 2015, at A1; see also Bachtel v. TASER Intern., Inc., 747 F.3d 965, 969 n.2 (8th Cir. 2014).

Corporal Condley's claim that he never heard anyone threaten to tase Matthew or saw anyone use a taser on him contradicts his own previous testimony. In a report prepared right after the incident, Condley stated that Stevens had "advised [Matthew] that he was going to tase him if he didn't exit the [car]." Later, at the mother's disorderly conduct trial in state court, Condley testified that he heard Stevens threaten to tase Matthew "two times," then saw Stevens "rase his taser," aim its "red dot" at Matthew, and "pull the trigger." The video made at the scene of the police stop shows Condley watching officer Stevens use the taser on Matthew from his side of the vehicle before moving over to restrain the mother who was trying to shield her

- 10 -

son. Although he now claims that the mother prevented him from intervening while Matthew was tased, Condley testified at the mother's state court trial that she "complied" with his instructions and "sat on the sidewalk."

Trooper Condley was present when Stevens first threatened to tase Matthew, then aimed the taser, and pulled its trigger. Condley did not say or do anything to deescalate the situation. He simply stood by and watched the deputies repeatedly tase the young man. See Krout v. Goemmer, 583 F.3d 557, 566 (8th Cir. 2009). Nor did he intervene after Matthew's mother was returned to the patrol car. There is no question that the law is "clearly established that an officer who fails to intervene to prevent the unconstitutional use of excessive force by another officer may be held liable for violating the Fourth Amendment." E.g., Nance v. Sammis, 586 F.3d 604, 612 (8th Cir. 2009). Also well established is that "one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge." E.g., Krout, 583 F.3d at 565.

Important issues of disputed fact remain on this record as to whether Corporal Condley failed a clearly established duty by not intervening while officers Stevens and Payton fired multiple taser shocks into Matthew's body. The experienced trial judge's denial of qualified immunity should be affirmed.

———————————————