# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-2696

_____

Bernard Jones; Alcohol and Drug Counseling Services, LLC; Healing Circle
Recovery Community, Inc.

*Plaintiffs - Appellees*

v.

Rick McNeese, Dr., Nebraska Department of Correctional Services, Assistant
Administrator of Behavioral Health-Substance Abuse, Individually

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska – Lincoln

_____

Submitted: May 16, 2013
Filed: March 26, 2014

_____

Before SHEPHERD, BEAM, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

This 42 U.S.C. §§ 1981 and 1983 lawsuit is before the Court on interlocutory appeal for a second time after we remanded the case for an additional consideration of the defendant's claim to qualified immunity. The district court determined on

remand that the defendant is not entitled to qualified immunity on any ground. We reverse.

## I. Background

### A. Facts

Bernard Jones, who is African American, was employed as a substance-abuse counselor by the Nebraska Department of Correctional Services (NDOC) from 1991 to 2007. While on injury leave from his job at NDOC in 1998 and 1999, Jones completed a practicum at First Step Recovery, Inc. ("First Step"), a privately owned substance-abuse rehabilitation facility that coordinates with the State of Nebraska to provide treatment services to persons on probation and parole. First Step is wholly owned by Dianne McNeese, Dr. Richard McNeese's ("Dr. McNeese") wife. Dr. McNeese was Assistant Administrator of Behavioral Health–Substance Abuse at NDOC from July 2005 until he resigned in October 2009. During his Assistant Administrator tenure, Dr. McNeese also worked as a consulting psychologist at First Step.

When Jones completed his practicum in 1999, Dr. McNeese offered to hire Jones to work part-time at First Step in addition to working at NDOC. Jones declined Dr. McNeese's offer because he perceived it to be racially motivated. Specifically, Jones testified that Dr. McNeese wanted to hire him at First Step to "work with the minorities, in particular the blacks," so that Jones could "attract more black clients . . . because that's a revenue source that [Dr. McNeese] [wanted] to get."

In 2000, Dr. McNeese again approached Jones about working part-time for First Step. This time, Dr. McNeese told Jones that he could work for First Step but practice at another substance-abuse treatment facility, Antlers, which had partnered with First Step in bidding on a $14 million federal contract. Jones accepted the offer

-2-

to work for First Step by way of Antlers because he would have the opportunity to work alongside Ron Namuth, the owner of Antlers and a person whom Jones described as a "great counselor" and perceived as having a "tremendous reputation."

Between six and nine months after Jones started working at Antlers, Dr. McNeese and Namuth had what Jones characterized as a "falling out." At that time, Namuth offered to buy out Jones's contract as an independent contractor with First Step if Jones agreed to work for Antlers and cease affiliating with First Step. Jones accepted Namuth's offer, cut all ties with First Step,[1] and continued working at Antlers until January 2008.

Throughout Jones's part-time employment with First Step and Antlers, Jones continued working full-time at NDOC until he retired in 2007. In 2005 or 2006, Jones approached Dr. McNeese about a concept that Jones was pursuing called "Healing Circle Recovery Community."[2] Jones intended to operate Healing Circle as a treatment center while employed at NDOC, but testified in his deposition that Dr. McNeese told him that he would be fired from NDOC if he did so. Dr. McNeese denies making any such statement, but admits that he and two other NDOC employees—one Caucasian and the other Pakistani—worked at First Step while still employed by NDOC. Jones subsequently approached NDOC Deputy Director Larry Wayne—who at all times occupied a position in NDOC superior to both Jones and Dr. McNeese—to discuss his proposal to perform part-time work outside of NDOC at Healing Circle. Wayne directed Jones to ask the NDOC legal department if there

---

[1]Jones testified that during the time he was affiliated with First Step but working at the Antlers facility, "the only involvement [he] had with McNeese" was that Dr. McNeese paid him.

[2]Jones incorporated Healing Circle Recovery Community, Inc. ("Healing Circle") in 2004, but did not further pursue operating Healing Circle until he approached Dr. McNeese in 2005 or 2006.

would be any conflict of interest, and the legal department said there would not be. The legal department concluded there was no conflict of interest because Healing Circle, as proposed by Jones, would be a women-only treatment center whereas Jones only worked with men at NDOC.

After retiring from NDOC in 2007, Jones also established Alcohol and Drug Counseling Services, LLC (ADCS), an outpatient treatment center for men only. ADCS and Healing Circle each began accepting clients in 2008, and each received payment for treatment services to parolees and persons on probation through different state-funded voucher systems. Healing Circle received vouchers primarily from the Nebraska Office of Probation, while ADCS received vouchers directly from NDOC.[3] ADCS received ninety-nine percent of its funding from the NDOC voucher system, and the NDOC vouchers to ADCS made up more than one-fourth of all distributed NDOC vouchers.

Dr. McNeese oversaw the NDOC voucher system from October 2008 to October 2009. Although the NDOC voucher system draws from a different pool of state funds than the Office of Probation voucher system, NDOC made arrangements for the Office of Probation to administer the NDOC vouchers. Under each respective voucher system, parolees and persons on probation are permitted to choose their own treatment facility, provided that the facility is on a list of NDOC-approved treatment providers. ADCS was on this list until June 30, 2009, when Dr. McNeese suspended ADCS from the list.

On June 29, 2009, Dr. McNeese learned from a supervisor of chemical dependency counselors at the NDOC that, the week before, Jones had visited inmates at a correctional facility in Lincoln, Nebraska to promote ADCS's treatment services. During the visit, Jones distributed forms to the inmates that many of them signed,

---

[3]Healing Circle did receive either one or two vouchers directly from NDOC.

thereby agreeing to utilize ADCS's outpatient treatment services upon their release. In an email dated June 29 and sent to various NDOC and Office of Probation administrators, Dr. McNeese characterized this practice as "highly inappropriate" and a "very serious violation" that, if true, "calls for immediate action due to [an] ethical breach."  The email read as follows:

> Here's the latest information on a practice I see as highly inappropriate.  I continue to be concerned that Mr. Jones uses his knowledge of DCS and previous professional relationships to obtain access to the inmate population, misrepresent DCS support of the program, and go so far as to "manipulate" inmates into signing an agreement.  I think this practice has the potential of creating an inappropriate power relationship in which he has perceived power over inmates as clients, including the implied power of supporting them with the Parole Board (and presumably the implied opposite of not supporting them).
>
> If [the] report is accurate, I see this as a very serious violation that calls for immediate action due to the ethical breach. . . . I also see this as something that may need attention from Legal.

On June 30, Dr. McNeese emailed Jones notifying Jones that he was suspending ADCS from the NDOC approved-provider list "pending further investigation."[4]  Dr.

---

[4]It is unclear whether Healing Circle was also suspended from the approved-provider list.  In the order on appeal, the district court stated that "Jones and his business*es* had been suspended from the [NDOC] voucher program and were no longer on the provider list." Jones v. McNeese, 883 F. Supp. 2d 897, 906 (D. Neb. 2012) ("Jones III") (emphasis added).  We find nothing in the record to indicate that Healing Circle was ever officially suspended from the approved-provider list.  We note, however, that Dr. McNeese's June 29 and June 30 emails copied Catherine Gibson-Beltz, who was involved in distributing the Office of Probation vouchers that were the primary funding source for Healing Circle, and Deb Minardi, the Deputy

McNeese testified in his deposition that he suspended ADCS because he believed that Jones violated certain confidentiality provisions of the Health Insurance Portability and Accountability Act (HIPAA). The NDOC legal department later informed Dr. McNeese that Jones's visit to the Lincoln correctional facility was a "non-issue." After learning that there was no HIPAA violation, however, Dr. McNeese did not reinstate ADCS on the approved-provider list. Dr. McNeese said later that the failure to do so was a "mistake on my part."

Around the same time that ADCS and Healing Circle were suspended from the approved-provider list, NDOC was soliciting bids from treatment facilities for a contract to become the sole provider of outpatient services for parolees and persons on probation; the contract was worth $200,000. Prior to ADCS's and Healing Circle's suspensions, ADCS and Healing Circle had received more NDOC vouchers than any other group of treatment facilities owned by and/or affiliated with a single participant in the NDOC voucher system; First Step had received the second-most vouchers. Because ADCS—and likely Healing Circle[5]—were suspended from the approved-provider list, they were also in effect precluded from bidding on and being awarded the sole-provider contract because one criteria was that the bidder be a current voucher recipient.

NDOC issued a letter of intent to award the sole-provider contract to First Step on August 25, 2009. On August 26, NDOC received a notice of grievance from an unsuccessful bidder and subsequently rescinded its letter of intent to contract with

Probation Administrator of the Nebraska Supreme Court. Additionally, as mentioned above, NDOC made arrangements for the Office of Probation to administer the NDOC vouchers. So while Healing Circle might not have been officially suspended from the approved-provider list, Dr. McNeese's emails that copied Gibson-Beltz and Minardi may have effected a de facto suspension of Healing Circle by way of its association with Jones.

[5]See footnote 4, *supra*.

-6-

First Step. NDOC then issued a second letter of intent to contract with a different treatment facility. On August 31, NDOC sent a third letter that rescinded all previously issued letters of intent and placed the NDOC sole-provider contract on hold.

Shortly after the August 26 grievance was filed, officials placed Dr. McNeese on unpaid administrative leave due to a conflict of interest. Although Dr. McNeese did not participate in evaluating the bid proposals to become NDOC's sole provider of treatment services, he was deemed "instrumental" in developing the criteria and the weighting system used to evaluate the proposals. Further, Dr. McNeese directly supervised the individuals who were responsible for evaluating the proposals, and he provided the written justification for initially awarding the contract to First Step. Dr. McNeese disclosed that his wife owned First Step, but failed to disclose the extent of he and his wife's financial interest in the entity as required by Nebraska law and NDOC Administrative Regulations. Dr. McNeese resigned from NDOC on October 8, 2009.

As a result of ADCS and Healing Circle being suspended from the NDOC approved-provider list, and thus losing their primary funding sources, ADCS closed in July or August 2009 and Healing Circle closed in October 2009. Jones eventually filed for personal bankruptcy due to his inability to make payments on loans that he took out in connection with ADCS and Healing Circle.

B. Procedural History

Jones, ADCS, and Healing Circle (collectively, "Plaintiffs") sued Dr. McNeese pursuant to 42 U.S.C. §§ 1981 and 1983 on December 28, 2009. The complaint alleges that Dr. McNeese treated Plaintiffs disparately because Jones is African American. Jones claims that Dr. McNeese's threat to fire him if he worked part-time at Healing Circle was based on Jones's race because non-African American NDOC

employees were permitted to "moonlight" at First Step. Jones also claims that Dr. McNeese, in his role as Assistant Administrator at NDOC, made statements to third parties that defamed Jones's character, that resulted in "loss of [Jones's] employment opportunities, loss of two viable businesses," and that "prevented [Jones] from pursuing [his] profession." Specifically, Jones testified in his deposition that Dr. McNeese told other State of Nebraska employees that Jones had "done fraudulent work," "gotten information from inmates illegally," and "entered corrections facilities illegally." Additionally, Jones testified that Dr. McNeese made statements to an administrator at a local college that Jones was being investigated for fraud. As a result, according to Jones, the college stopped sending students to Healing Circle to intern.

Dr. McNeese moved to dismiss the claims against him based on qualified immunity, and later moved for summary judgment on the same basis. The district court denied Dr. McNeese's motion for summary judgment. Jones v. McNeese, No. 4:09CV3264, 2011 WL 2200763, at *2 (D. Neb. June 6, 2011) ("Jones I"). Dr. McNeese appealed the district court's denial of summary judgment, and this Court vacated the denial and remanded the case "for a more detailed consideration and explanation of the validity, or not, of the defendant's claim to qualified immunity." Jones v. McNeese, 675 F.3d 1158, 1163 (8th Cir. 2012) ("Jones II").

On remand, the district court again determined that Dr. McNeese was not entitled to qualified immunity on any ground. Jones III, 883 F. Supp. 2d at 914–15. Dr. McNeese subsequently filed this interlocutory appeal in which he raises two arguments. First, Dr. McNeese claims that the district court erred by adopting Jones's version of the facts and by failing to employ the proper standard to evaluate his claim to qualified immunity on summary judgment. Second, Dr. McNeese argues that, applying the proper standard, he is immune from suit.

## II. Analysis

"Qualified immunity 'is an *immunity from suit* rather than merely a defense to liability.' It entitles an individual to not be subject to trial or the other burdens of litigation and 'is effectively lost if a case is erroneously permitted to go to trial.'" Solomon v. Petray, 699 F.3d 1034, 1038 (8th Cir. 2012) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). An individual is only denied qualified immunity if the answers to the following two questions are yes: "(1) whether the plaintiff has shown the violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged misconduct. We retain discretion to decide which of the two questions to answer first." Heartland Acad. Cmty. Church v. Waddle, 595 F.3d 798, 805 (8th Cir. 2010).

This Court reviews *de novo* the district court's denial of summary judgment based on qualified immunity. Bearden v. Lemon, 475 F.3d 926, 929 (8th Cir. 2007). In so doing, we consider the evidence presented in a light most favorable to the nonmoving party. Id. See also Scott v. Harris, 550 U.S. 372, 378 (2007) ("When [the parties' versions of events differ substantially], courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.' In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." (second alteration in original) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam))). However, "[w]hile we review the record in the light most favorable to . . . the non-moving party, we do not stretch this favorable presumption so far as to consider as evidence statements found only in *inadmissible hearsay*." Mays v. Rhodes, 255 F.3d 644, 648 (8th Cir. 2001) (emphasis added). See also Moore v. Indehar, 514 F.3d 756, 758 (8th Cir. 2008) ("[I]n construing the record, the 'court may consider only the portion of the submitted materials that is admissible or useable at trial.'" (quoting Walker v. Wayne County, 850 F.2d 433, 434 (8th Cir.1988))).

## A. Jurisdiction

Before turning to the merits, we first address our jurisdiction.  In <u>Mitchell</u>, the Supreme Court articulated the role of appellate courts in reviewing the denial of summary judgment based on qualified immunity:

> An appellate court reviewing the denial of the defendant's claim of [qualified] immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim.  All it need determine is a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, in cases where the district court has denied summary judgment for the defendant on the ground that even under the defendant's version of the facts the defendant's conduct violated clearly established law, whether the law clearly proscribed the actions the defendant claims he took.

472 U.S. at 528.  The Court "emphasize[d] . . . that the appealable issue is a purely legal one: whether the facts alleged . . . support a claim of violation of clearly established law."  <u>Id.</u> at 528 n.9.

Here, Plaintiffs contend that Dr. McNeese's argument on appeal "is not based on an abstract issue of law," but instead is "one of fact."  Plaintiffs are correct that throughout his brief, Dr. McNeese argues that the district court improperly denied summary judgment to him based on erroneous factual findings.  These evidentiary challenges asserted by Dr. McNeese are outside the scope of our review on appeal.  <u>See</u> <u>Kahle v. Leonard</u>, 477 F.3d 544, 549 (8th Cir. 2007) ("In [an appeal from denial of qualified immunity], jurisdiction does not extend to issues of 'evidence sufficiency, *i.e.*, which facts a party may, or may not, be able to prove at trial.'" (quoting <u>Johnson v. Jones</u>, 515 U.S. 304, 313 (1995) (internal quotation marks omitted))).

-10-

Nevertheless, "a determination that there are controverted issues of material fact . . . does not mean that *every* . . . denial of summary judgment is nonappealable." Behrens v. Pelletier, 516 U.S. 299, 312–13 (1996) (citation omitted). "[S]ummary judgment determinations *are* appealable when they resolve a dispute concerning an 'abstract issu[e] of law' relating to qualified immunity—typically, the issue [of] whether the federal right allegedly infringed was 'clearly established.'" Id. at 313 (second alteration in original) (citations omitted). Here, in addition to objecting to the district court's factual findings, Dr. McNeese also challenges the district court's determinations that he violated Jones's constitutional rights and that such rights were clearly established at the time of the alleged violations. We are thus satisfied that we have jurisdiction over the interlocutory appeal.[6]

## B. Merits

Jones alleges that Dr. McNeese violated his rights pursuant to the Fourteenth Amendment's Equal Protection Clause and Due Process Clause, respectively. We address each claim below.

### 1. Equal Protection

#### a. Racial Discrimination

Jones grounds his equal-protection claims in 42 U.S.C. §§ 1981 and 1983. Section 1981 is limited to race and provides in relevant part that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Jones alleges that because he is African American,

---

[6]Accordingly, Plaintiffs' motion to dismiss the appeal for lack of jurisdiction and Dr. McNeese's motion to strike Plaintiffs' dismissal motion as untimely filed are denied.

ADCS and Healing Circle were precluded from submitting bids for the NDOC sole-provider contract and were thus discriminated against on account of Jones's race. See Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 476 (2006) (noting that "a contractual relationship need not already exist[] because § 1981 protects the would-be contractor along with those who already have made contracts"). Although § 1981 permits a cause of action against private actors, where, as here, a plaintiff brings a claim pursuant to § 1981 against an individual who was acting under color of law, the claim must be asserted through § 1983. Artis v. Francis Howell N. Band Booster Ass'n Inc., 161 F.3d 1178, 1181 (8th Cir. 1998).

In support of his § 1981 claim, Jones points primarily to one instance of alleged racial discrimination—the allegation that Dr. McNeese told Jones that Jones would be fired if he formed and operated Healing Circle and worked there part-time while still employed at NDOC. Jones asserts that because Dr. McNeese permitted two non-African American counselors to "moonlight" at First Step while still employed at NDOC, Dr. McNeese harbored a racial animus towards Jones and thus discriminated against Jones, Healing Circle, and ADCS when he suspended the businesses from the approved-provider list during the time that NDOC was accepting bids for the sole-provider contract. Dr. McNeese maintains, however, that the suspension was based on his perception of an alleged HIPAA violation.

Dr. McNeese asks this Court to employ the three-step burden-shifting standard in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973). Under a McDonnell Douglas analysis,

> [a plaintiff] has the initial burden to establish a prima facie case of discrimination. If [the plaintiff] establishes a prima facie case, the burden shifts to [the defendant] to articulate a legitimate, non-discriminatory reason for [the allegedly unconstitutional] action. If [the defendant] articulates such

a reason, the burden returns to [the plaintiff] to prove that the proffered reason is pretextual.

Wimbley v. Cashion, 588 F.3d 959, 961 (8th Cir. 2009) (citations omitted). Regardless of whether Jones meets his initial burden and Dr. McNeese fails to carry his responsive burden, however, the "ultimate question" that remains is "whether the employer engaged in intentional discrimination" on the stated basis. Rothmeier v. Inv. Advisers, Inc., 85 F.3d 1328, 1334–35 (8th Cir. 1996). Thus, "proof that the defendant's articulated explanation is false or incorrect does not, standing alone, entitle the plaintiff to judgment; instead, the showing must be that the explanation is a pretext *for* discrimination." Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 777 (8th Cir. 1995); see St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 n.4 (1993) ("Even though . . . rejection of the defendant's proffered reasons is enough at law to *sustain* a finding of discrimination, *there must be a finding of discrimination*.").

Here, Jones has not put forth sufficient evidence to demonstrate that Dr. McNeese's decisions to permit other employees to "moonlight" while employed at NDOC, and later to suspend ADCS and Healing Circle from the approved-provider list during the time that NDOC was accepting bids, were motivated by any *racial* animus. Jones himself previously moonlighted at First Step while employed at NDOC in 1998 and 1999 and at Antlers from 2000 through his retirement from NDOC in 2007. Thus, even accepting the district court's finding that Dr. McNeese was aware that there was no HIPAA violation, see Jones III, 883 F. Supp. 2d at 915, there is no evidence to support the district court's findings that the adverse actions against Healing Circle and ADCS were taken *on account of Jones's race*.[7] See, e.g.,

_____

[7]Jones also points to one instance in which Dr. McNeese called Jones into his office and asked Jones to help him assist in finding "people of color" to become substance-abuse counselors. Jones testified that he perceived the comment to be racist. However, such "[s]tray remarks are not sufficient to establish a claim of discrimination." Clearwater v. Indep. Sch. Dist. No. 166, 231 F.3d 1122, 1126 (8th

Twiggs v. Selig, 679 F.3d 990, 994–95 (8th Cir. 2012) ("Because [plaintiff] has failed to offer evidence that could convince a reasonable jury that [defendants'] stated reason for firing her was pretext for intentional discrimination, her claim fails as a matter of law, and [the defendants] are entitled to qualified immunity."); Omni Behavioral Health v. Miller, 285 F.3d 646, 655 (8th Cir. 2002) (affirming grant of summary judgment to § 1983 defendant because the plaintiff's "evidence of intentional [racial] discrimination [was] insufficient as a matter of law"). The fact that Jones is African American appears to have been of no consequence as it related to Dr. McNeese allegedly threatening to fire Jones if he were to operate Healing Circle while still employed at NDOC. Rather, instead of race, the characteristic that distinguishes Dr. McNeese's treatment of Jones from his treatment of the two non-African American employees was the outside business for whom the other two employees worked—First Step.[8] In any event, for the above reasons, we reverse the district court's judgment that Dr. McNeese is not entitled to qualified immunity on the § 1981 claim.

---

Cir. 2000) (internal quotation marks omitted); see, e.g., Simmons v. Oce-USA, Inc., 174 F.3d 913, 915–16 (8th Cir. 1999) (terminated employee failed to establish causal link between adverse employment action and one-time use of racial slur and racial joke in the context of employment relationship, where the racial slur and racial joke were made two years prior to the employee's termination).

[8]In this regard, we note that the record could conceivably support a cause of action predicated on some type of legal theory tethered to nepotism: that is, favoritism toward Dr. McNeese's wife's business, First Step, and a desire to protect it from competitors like Jones. Accord Backlund v. Hessen, 104 F.3d 1031, 1034 (8th Cir. 1997) ("[N]epotism in governmental hiring requires some measure of justification before it can pass constitutional muster. Such justification must connect the challenged hiring criterion to the capacity of the applicant to perform the duties of the job applied for."). Plaintiffs never advanced such a theory for their equal protection claim, though, and we decline to consider it for the first time in this appeal.

## 2. Due Process

Plaintiffs also allege that Dr. McNeese violated their rights under the Fourteenth Amendment's Due Process Clause. In particular, they claim that Dr. McNeese made stigmatizing comments about Jones that deprived Jones of his liberty interest to earn a living in his profession as a substance abuse counselor.

In Paul v. Davis, the Supreme Court made clear that injury to reputation alone is not sufficient to state a § 1983 claim. 424 U.S. 693, 712 (1976) ("[I]nterest in reputation . . . is neither 'liberty' nor 'property' guaranteed against state deprivation without due process of law."). The Court intimated, however, that reputational harm coupled with "some more tangible interests such as employment," can together be "sufficient to invoke the procedural protection of the Due Process Clause." Id. at 701. See, e.g., Owen v. City of Independence, Mo., 560 F.2d 925, 935 (8th Cir. 1977) ("In determining whether a government employer has deprived its employee of a liberty interest in the termination of employment, the crucial issue is whether the government employer, in connection with the termination of government employment, including a refusal to rehire or reemploy, makes a charge which might seriously damage the employee's standing and reputation in the community."), vacated and remanded on other grounds, 438 U.S. 902 (1978).

For a defamatory statement to be actionable under § 1983, it must go beyond "alleging conduct [by the plaintiff] that fails to meet professional standards," Raposa v. Meade Sch. Dist. 46-1, 790 F.2d 1349, 1354 (8th Cir. 1986). Rather, the statement must "damage[] a person's standing in the community or foreclose[] a person's 'freedom to take advantage of other employment opportunities.'" Id. (quoting Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 573 (1972)). "The requisite stigma has generally been found in cases in which [a government official] has accused the [plaintiff] of dishonesty, immorality, criminality, racism, or the like." Shands v. City of Kennett, 993 F.2d 1337, 1347 (8th Cir. 1993) (collecting cases).

-15-

Although Paul's "stigma-plus" test arises most often in situations where the plaintiff is (or was) a government employee, e.g., Brown v. Simmons, 478 F.3d 922, 923 (8th Cir. 2007), the liberty interest also extends to independent contractors.[9] See, e.g., Transco Sec., Inc. v. Freeman, 639 F.2d 318, 321 (6th Cir. 1981) ("While the deprivation of the right to bid on government contracts is not a property interest . . . , the bidder's liberty interest is affected when that denial is based on charges of fraud and dishonesty." (internal citation omitted)); see also Neu v. Corcoran, 869 F.2d 662, 667 (2d Cir. 1989) ("[Paul] did not say that 'employment' had to be *government* employment.").

Here, Plaintiffs *allege* in their complaint, and Jones testified in his deposition, that Dr. McNeese told third parties numerous stigmatizing comments about Jones. To wit, Jones testified that Dr. McNeese told "numerous State of Nebraska employees," as well as an administrator at a local college, that Jones was "under investigation," that he "had done fraudulent work," that he "had stolen or gotten information from inmates illegally," and that he "had entered correctional facilities illegally." Jones III, 883 F. Supp. 2d at 906. On their face, such statements, if untrue, appear to be sufficiently "stigmatizing" to satisfy Paul insofar as they relate to "dishonesty, immorality, [and] criminality." Shands, 993 F.2d at 1347. Further, Jones was removed from the voucher list—which effectively eviscerated his ability to work in his chosen profession—so he could conceivably show a causal connection between the alleged comments and Jones' inability to work in his chosen profession going forward. See Raposa, 790 F.2d at 1354.

The problem for Jones, however, is that in the procedural posture of this case—an appeal from a summary judgment order denying qualified immunity—Jones

_____

[9]We assume without deciding that ADCS's and Healing Circle's receipt of vouchers was sufficient for Plaintiffs to be considered independent contractors.

has not presented enough *admissible* evidence to go forward on his due process claim. Specifically, Plaintiffs' assertions in their complaint and Jones's deposition testimony about Dr. McNeese's alleged statements to third-parties are hearsay and cannot be used to defeat a motion for a summary judgment. See F. R. Evid. 801(c)(1)–(2) ("'Hearsay' means a statement that . . . the declarant does not make while testifying at the current trial or hearing; and a party offers [the statement] in evidence to prove the truth of the matter asserted in the statement."); Brunsting v. Lutsen Mountains Corp., 601 F.3d 813, 817 (8th Cir. 2010) (noting that "inadmissible hearsay evidence cannot be used to defeat summary judgment"). Importantly, whether or not *McNeese's statements* (e.g., that Jones was "under investigation" and had done "fraudulent work") are true does not matter for the purposes of the hearsay analysis on this issue. What matters is that Jones offers the *third-parties' statements* for their truth—specifically, that McNeese said these things about Jones to them. The third-parties' statements as described by Jones are hearsay, not within any exception, and therefore are of no use to Plaintiffs in their efforts to defeat Dr. McNeese's summary judgment motion. See Brunsting, 601 F.3d at 817.

Admissible evidence contained in the summary judgment record shows that Dr. McNeese sent an internal memorandum to personnel in other state governmental agencies, see *supra* note 4, alleging that Jones may have engaged in ethically questionable conduct. Specifically, Dr. McNeese's June 29 email alleged that Jones's visit to inmates at a prison was "a practice [Dr. McNeese] see[s] as highly inappropriate" because it "has the potential of creating an inappropriate power relationship in which [Jones] has perceived power over inmates as clients." Dr. McNeese said that he viewed the visit as an "ethical breach." Jones was not made aware of these allegations against him until Dr. McNeese sent Jones an email on June 30 suspending ADCS from the approved-provider list "[p]ending further investigation."

We conclude that the substance of these two emails, standing alone, does "not create the level of stigma required to implicate a constitutionally protected liberty interest." Shands, 993 F.2d at 1347. Dr. McNeese admits that the legal department told him that Jones's visit to the prison was a "non-issue," but Dr. McNeese did not describe them as such at the time he sent the emails and removed Jones from the voucher list. In hindsight, Dr. McNeese may have overreacted to Jones's conduct—conduct that the legal department found perfectly permissible.[10] Dr. McNeese admitted that he should have taken action to place Jones back on the list after consulting the legal department; he called his failure to do so "a mistake." But while the emails raised concerns about Jones's actions, they did not rise to the level of constitutional stigma we have found in other cases. Compare Shands, 993 F.2d at 1347 (finding insufficient stigma where a fire chief fired certain firefighters and made public statements concerning the firefighters' "insubordination and misconduct"), with Winegar v. Des Moines Indep. Cmty. Sch. Dist., 20 F.3d 895, 899 (8th Cir. 1994) (finding sufficient stigma where a school district leveled "allegations of unjustified child abuse" against a school teacher).

Dr. McNeese received a report from a supervisor of substance abuse counselors at NDOC that Jones had visited a prison facility to hand out fliers for ADCS. Dr. McNeese forwarded this report, along with his "concerns," to other people involved in the voucher system. He voiced his opinion that "he s[aw]" Jones's actions as "highly inappropriate," and that he *thought* Jones's visits to the inmates "had the potential of creating" appearances of impropriety. Dr. McNeese's analysis was mistaken, and when the legal department did not find any wrongdoing with Jones's conduct, Dr. McNeese could have, and probably should have, sent a follow-up email. Here, it was Dr. McNeese's inaction that further harmed Jones; however, without

---

[10]The record provides one explanation for Dr. McNeese's overreaction: his interest in protecting First Step (his wife's business) from competitors. See footnote 8, *supra.*

additional evidence, we decline to draw any inferences from Dr. McNeese's "mistake" in not placing Jones back on the approved-provider list. In the final analysis, Dr. McNeese harmed Jones's ability to pursue his chosen profession. Even so, the evidence presented is not enough to show that Dr. McNeese stigmatized Jones to such a degree as to violate the Constitution. See, e.g., Winegar, 20 F.3d at 899 ("An employee's liberty interests are implicated where the employer levels accusations at the employee that are so damaging as to make it difficult or impossible for the employee to escape the stigma of those charges.").[11] As Jones cannot demonstrate a constitutional violation, Dr. McNeese is necessarily entitled to qualified immunity. See White v. Smith, 696 F.3d 740, 753 (8th Cir. 2012) (noting that both prongs of the qualified immunity analysis must be met to defeat qualified immunity).

## III. Conclusion

For the reasons set forth above, we hold that Dr. McNeese is entitled to qualified immunity on Jones's §§ 1981 and 1983 claims. We reverse the judgment of the district court with instructions to dismiss the complaint.

_____

---

[11]Because we hold that Plaintiffs have not produced sufficient evidence to establish constitutional stigma, we do not address whether Jones was unable to pursue his chosen profession generally because of Dr. McNeese's statements. See Habhab v. Hon, 536 F.3d 963, 968 (8th Cir. 2008).