# United States Court of Appeals

### For the Eighth Circuit

_____

No. 14-1571

_____

Jimmy Lee Letterman; Annette Fay Letterman

*Plaintiffs - Appellees*

v.

Jon Does, individually, and in their official capacities; Steven Lammers; Noreen Gastineau

*Defendant*s

Jerry Farnsworth; Bryan Earls; Marcia Jennings

*Defendants - Appellants*

_____

Appeal from United States District Court
for the Western District of Missouri - St. Joseph

_____

Submitted: January 13, 2015
Filed: June 16, 2015

_____

Before LOKEN, MURPHY, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Three days after leaving a Missouri jail, Danial Letterman passed away from injuries he suffered in his cell. His parents sued a number of prison employees under 42 U.S.C. § 1983, claiming, among other things, that prison employees were deliberately indifferent to Danial's medical needs. Three defendants moved for summary judgment on the deliberate indifference claims, asserting qualified immunity. The district court denied summary judgment as to all three defendants. We affirm in part and reverse in part.

I

Because this is an appeal from a denial of qualified immunity, the court must construe the facts in the light most favorable to the Lettermans as the nonmoving party. See Jones v. McNeese, 746 F.3d 887, 894 (8th Cir. 2014).

Danial Letterman received a 120-day "shock" sentence after police found him possessing marijuana. He was transferred to the Missouri Western Reception, Diagnostic and Correction Center in November 2011. Within a week of transfer, Danial was experiencing mental health problems, and psychologists recommended he be placed on suicide watch. Prison staff placed Danial in the transitional care unit (TCU), the prison's "hospital" ward.

On November 17, Danial became manic. He beat his hand on the wall of his concrete cell, repeatedly kicked the door, and, according to some rumors, beat his head against the wall. The same day, Lieutenant Bryan Earls, complying with a request from mental health personnel, put together a five-person extraction team to move Danial from his concrete cell to a padded cell. The padded cell was reserved for only the most seriously mentally affected prisoners, generally those who would try to injure themselves or others. Due to the circumstances surrounding Danial's move, prison policy required multiple officers be present before opening the padded cell.

After the team moved Danial, he remained in a manic state. Danial was placed on suicide watch. Prison employees knew he was under the highest level of observation, requiring in-person checks four times an hour according to prison policy. During these checks, employees were supposed to receive an affirmative response from Danial. Employees were also required to log their observations. If a prisoner did not respond, a different prison policy required the employee to notify "central command."

Correctional officer Steven Lammers[1] began his shift at 11:00 p.m. on November 17. His supervisor briefed him that a five-person extraction team had placed Danial in the padded cell. Lammers was responsible for the in-person checks during his shift. Rather than complying with prison policy, however, Lammers merely viewed Danial through a monitor. Lammers initially saw Danial stumbling around the cell and mumbling to himself.

Around 11:26 p.m. on November 17, Danial fell backwards in the padded cell and hit his head against a wall. Danial slid down the wall and remained in a sitting position for a while. About twenty minutes later, he fell backward again and hit his head on the door jamb. Lammers heard a loud thud and went to check on Danial in person. Danial told Lammers that he injured his head and needed medical attention. Lammers spoke with a nurse, but neither he nor the nurse opened the cell door. Lammers obtained no additional responses from Danial during the rest of Lammers's shift.

---

[1]Lammers, another defendant in the case, did not seek qualified immunity on the deliberate indifference claim.

Noreen Gastineau,[2] another correctional officer, took over for Lammers at 7:30 a.m. on November 18. Lammers told Gastineau that Danial had fallen very hard around midnight and had not moved. Lammers also told a nurse, Brett Hook, about Danial when Hook began her shift at 7:00 a.m.

A little before 9:00 a.m., a psychologist came to check on Danial. The psychologist told Gastineau that Danial needed to be awoken. Gastineau and Nurse Hook kicked Danial's door and struck it with keys. Gastineau even splashed water on Danial's face through an opening in the cell door. Danial responded merely by moving his eyes "slightly" and groaning. At some point, the psychologist asked that Danial's cell be opened, but Gastineau told the psychologist no.

Nurse Hook told Gastineau that she needed to get the door to the padded cell open so she could perform a check on Danial. Around 10:40 a.m., Gastineau called Sergeant Jerry Farnsworth to obtain permission to open Danial's cell. Farnsworth was in charge of the unit and was responsible for the well-being of all prisoners in the unit. During the call, Gastineau told Farnsworth that Danial had not moved since the beginning of her shift at 7:30 a.m. and had refused lunch. Gastineau also told Farnsworth that medical personnel had requested that the door be opened. Despite being aware that medical personnel generally ask to open the padded cell only in the case of emergency or potential emergency, Farnsworth responded that he was supervising lunch and did not have correctional personnel available to open the padded cell. Gastineau hung up without saying anything else. Farnsworth did not go to the TCU nor did he follow up with Gastineau or any other prison personnel.

Gastineau and Nurse Hook did not inform anyone else of Danial's condition until Earls entered the TCU around noon. On that day, Earls was the Lieutenant in

_____

[2]Like Lammers, Gastineau is a defendant in the case and did not seek qualified immunity on the deliberate indifference claim.

- 4 -

charge and acting assistant shift commander. Gastineau told Earls that Danial had been laying in one spot all day and that she had made several unsuccessful attempts to get a response from Danial. Nurse Hook asked Earls to open the cell so she could get Danial's vitals. Nurse Hook also told Earls that she and Gastineau could not wake Danial and that Danial "had been in the same position since Hook began her shift." In addition to this information, Earls had been informed at a meeting earlier that morning that mental health's request for the move the night before was in part because Danial had been banging his head against a concrete floor. Despite knowing that prisoners are placed in the padded cell only when they have serious mental-health issues and nurses generally do not ask the guards to open the padded cell absent a potential emergency, Earls responded, "let sleeping dogs lie" and refused to open Danial's cell.

Danial continued to lay in his cell without any prison official opening the door. At noon, Marcia Jennings, a case manager who was assigned to the Administrative Segregation Unit, a larger unit of the prison containing the TCU, became the acting functional unit manager. In this role, Jennings was responsible for classifying and overseeing the classification of all prisoners in the administrative segregation unit. Her duties did not touch on security or medical issues. She focused solely on the status of inmates. At 2:00 p.m., she went to the TCU to write in Danial's log. She knew Danial was banging his head in the concrete cell previously, so she was a bit concerned. She encountered Gastineau near Danial's cell and asked Gastineau about Danial. Gastineau responded that Danial had not moved and had refused meals. Gastineau also told Jennings nurses had stated Danial was okay so long as he was breathing. Jennings knew she could call a "Code 16," which would denote a medical emergency and would allow the medical team to take over and open Danial's cell even without correctional personnel. Jennings did not call a Code 16. Instead, she went back to her office and began making phone calls to determine how to proceed in light of her concerns about Danial. Before Jennings was able to make contact with any of her supervisors, a lieutenant called her to ask whether a team could open Danial's cell.

- 5 -

When the team reached Danial's cell, Nurse Hook recognized that Danial needed immediate medical attention. His temperature was below 90 degrees, his pulse was somewhere between 30 and 34 beats per minute, and his eyes were fixed and dilated. An ambulance took Danial to the hospital, and doctors pronounced him dead three days later.

Numerous doctors reviewed Danial's case and determined the cause of his death was a subdural hematoma caused by the falls in his cell. One doctor remarked that the fall would have caused Danial to become unconscious and that any lay person would have recognized the injury was serious in nature. Each moment that passed without medical attention increased Danial's chance of injury and death.

Danial's parents sued various prison employees under section 1983, citing violations of Danial's Eighth Amendment rights.[3] The Lettermans dismissed a number of defendants, leaving only Lammers, Gastineau, Farnsworth, Earls, and Jennings.

Relevant to this appeal, Farnsworth, Earls, and Jennings moved for summary judgment on the Lettermans' deliberate indifference claims, asserting qualified immunity. The district court found that, at a minimum, the Lettermans had presented evidence from which a jury could find that the defendants knew of a substantial risk of serious harm and deliberately disregarded that risk. Those three defendants appeal.

II

We review the district court's denial of summary judgment de novo. Jones v. McNeese, 746 F.3d 887, 984 (8th Cir. 2014). To survive a challenge based on qualified immunity, a plaintiff must show the defendants violated a person's

---

[3]The Lettermans also sued under other theories not at issue on this appeal.

constitutional right and the constitutional right was clearly established at the time of the violation. Id. The parties agree that a prison official who is deliberately indifferent to the medical needs of a prisoner violates the prisoner's constitutional rights. See Farmer v. Brennan, 511 U.S. 825, 828 (1994); Estelle v. Gamble, 429 U.S. 97, 104 (1976). Appellants challenge simply whether their actions, as supported by the evidence and reasonable inferences drawn from that evidence when taken in the light most favorable to the Lettermans, constitute deliberate indifference.

The Lettermans first argue the question presented goes beyond our jurisdiction. We have jurisdiction to hear the appeal only if it presents a question of law. Mitchell v. Forsyth, 472 U.S. 511, 530 (1985). The Lettermans assert Appellants are attempting to challenge a factual, rather than a legal, conclusion; we disagree. We retain jurisdiction to consider legal issues, such as the application of law to set of facts. Id. at 528. In this case, we retain jurisdiction to answer Appellants' legal question: "whether the facts [as presented on summary judgment] support a claim of violation of clearly established law." Id. at 528 n.9; see also Jones, 746 F.3d at 895; Gordon v. Frank, 454 F.3d 858, 861 (8th Cir. 2006) ("Here, qualified immunity turns on the legal question whether appellants clearly violated the Eighth Amendment.").

To succeed on an Eighth Amendment claim in this context, Plaintiffs must prove two elements. First, a plaintiff must show there was a substantial risk of serious harm to the victim, an objective component. Gordon, 454 F.3d at 862. This element is not at issue. The parties agree Danial was at risk of suffering serious harm without medical attention. Second, a plaintiff must show that the prison official was deliberately indifferent to that risk of harm, a subjective component. Id.

The deliberate indifference element has two components: an actor must "know[] of and disregard[] an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837. "Under this subjective prong, the evidence must show that the officers recognized that a substantial risk of harm existed *and* knew that their conduct was

inappropriate in light of that risk." Krout v. Goemmer, 583 F.3d 557, 567 (8th Cir. 2009) (emphasis in original). Plaintiffs must first demonstrate that defendants knew of the substantial risk of serious harm to the victim. Jackson v. Everett, 140 F.3d 1149, 1152 (8th Cir. 1998). A party need not necessarily show that the actor actually knew of the substantial risk of harm to an inmate; the district court can infer knowledge if the risk was obvious. See, e.g., Farmer, 511 U.S. at 842–43 (explaining factfinders can infer knowledge from a variety of sources and that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious"); Gregoire v. Class, 236 F.3d 413, 417 (8th Cir. 2000) ("[T]his knowledge[, that the defendant was aware of a substantial risk of serious harm,] is subject to proof by all the usual ways, including inferences based on the obviousness of the risk."); Jackson, 140 F.3d at 1152 (stating that the question of knowledge turns on "whether an excessive risk to [the inmate's] health or safety was known *or obvious*" (emphasis added)). It is sufficient to show that "the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it." Farmer, 511 U.S. at 842.

After showing knowledge, Plaintiffs then must demonstrate the actor deliberately disregarded that risk. Jackson, 140 F.3d at 1152. The plaintiff must show the official "knew that their conduct was inappropriate in light of" the risk to the prisoner. Krout, 583 F.3d at 567. Deliberate indifference constitutes more than mere negligence. Farmer, 511 U.S. at 835. It must be "more than ordinary lack of due care for the prisoner's . . . safety." Id. (internal quotation marks omitted). The test is akin to the criminal rule of "recklessness." Id. at 839–40; see also Gordon, 454 F.3d at 862 ("The subjective inquiry must show a mental state akin to criminal recklessness."). Although the level of blameworthiness must rise above negligence, a plaintiff does not have to show that the prison officials acted "for the very purpose of causing harm or with knowledge that harm w[ould] result." Farmer, 511 U.S. at 835. Generally, the actor manifests deliberate indifference by "'intentionally denying or delaying access to medical care, or intentionally interfering with treatment or

- 8 -

medication that has been prescribed.'" Krout, 583 F.3d at 567 (quoting Pietrafeso v. Lawrence Cnty., 452 F.3d 978, 983 (8th Cir. 2006)). Further, "the obvious inadequacy of a response to a risk may support an inference that the officer recognized the inappropriateness of his conduct." Id.

When evaluating whether an actor deliberately disregarded a risk, we consider "his actions in light of the information he possessed at the time, the practical limitations of his position and alternative courses of action that would have been apparent to an official in that position." Gregoire, 236 F.3d at 419. We must avoid determining the question "with hindsight's perfect vision." Jackson, 140 F.3d at 1152. We now evaluate each Appellant's actions to determine whether there is sufficient evidence for a jury to find deliberate indifference.

## A. Farnsworth

Farnsworth argues he is entitled to qualified immunity because he did not know of Danial's medical need or a substantial risk of serious harm such that Farnsworth would have known that his response was inappropriate. It is undisputed Farnsworth did nothing to respond to Danial's need (e.g., he did not follow up with anyone, did not ask anyone else to check on Danial, and did not go to the TCU). Farnsworth challenges only the knowledge aspect of the claim.

Plaintiffs do not contend anyone told Farnsworth directly about Danial's condition. Rather, they argue the facts demonstrate Farnsworth had knowledge of a risk based on inferences from "obvious" dangers. See Farmer, 511 U.S. at 842–43 (noting knowledge can be inferred from obvious risks).

The pertinent facts can be summarized as follows: Gastineau called Farnsworth and told him that medical personnel wanted to check Danial's vitals and conduct a well-being check. Gastineau told Farnsworth that Danial had refused lunch and had

- 9 -

not moved since Gastineau started her shift (approximately three and half hours beforehand). Farnsworth knew from his experience that only the most at-risk inmates are placed in the padded cell and that requests to open the padded cell from medical personnel are unusual. He also knew that a request to open the padded cell generally meant there was an emergency or a potential emergency. Finally, Farnsworth knew prison policy dictated that if a prisoner fails to respond, central command is to be notified. This evidence, taken together, supports the inference that Farnsworth knew of the risk to Danial. In light of this knowledge, Farnsworth did nothing; he told Gastineau he could not check on Danial because he was busy passing out meals to other inmates.

Farnsworth also claims he is absolved of any liability because the nurse in the wing, Nurse Hook, stated she was not concerned about Danial when Gastineau asked Farnsworth to open the cell. Farnsworth argues that because a medically trained employee more familiar with the situation allegedly did not show concern, then he—someone less familiar with the situation and without medical training—could not have recognized a substantial risk of harm. To support his argument, Farnsworth relies on Krout. Farnsworth's reliance on Krout, however, is misplaced. Krout held that a prison guard's failure to act did not constitute deliberate indifference where two EMS technicians informed the guard that no additional medical attention was necessary and the prison guard relied on the technicians' statements. 583 F.3d at 568–69. The focus of Krout was the *guard's* knowledge of the severity of the risk, not the EMS technicians' beliefs. Id. We focus on the mind of the prison official and the information at his disposal, not the thoughts of third-party actors who do not disclose their thoughts. See id. Here, Farnsworth heard only that a nurse wanted the door open to take Danial's vitals. Even assuming Nurse Hook was not concerned about Danial, there is no evidence that Farnsworth was aware of this lack of concern or relied on it when Farnsworth decided to take no action.

A jury could infer from this evidence that a person in Farnsworth's position would have recognized a substantial risk of harm to Danial, acted inappropriately in light of the risk, and recognized the impropriety of his response. See Krout, 583 F.3d at 567 ("[T]he obvious inadequacy of a response . . . may support an inference that the officer recognized the inappropriateness of his conduct."). We therefore affirm the denial of summary judgment with respect to Farnsworth.

## B. Earls

Earls also claims that he was unaware of a substantial risk of serious harm to Letterman. Like Farnsworth, Earls makes no argument that he took any steps to provide Danial medical aid. Also like Farnsworth, the issue is simply whether Earls had knowledge of the substantial risk of serious harm to Danial such that his inaction would be considered deliberate indifference.

Earls attended at a staff meeting in the morning of November 18 at which he learned that the reason he had moved Danial the night before was in part because Danial had been banging his head against the concrete in Danial's concrete cell.[4] A short time later, Earls entered the TCU and viewed Danial on the video monitor. Nurse Hook asked Earls to open the cell and told Earls that she could not wake Danial and that Danial had been lying in the same position since midnight (roughly 12 hours). Gastineau also talked to Earls about opening the cell, telling Earls that medical personnel needed to get in because Danial had not moved and Gastineau herself had failed to get a response from Danial despite multiple attempts. Like Farnsworth, Earls knew that only the most at-risk inmates are placed in the padded cell and that medical personnel ask officers to open the padded cell only on rare

---

[4]Earls denies this was discussed at the staff meeting, but the record—taken in the Lettermans' favor—demonstrates Jennings attended a committee meeting along "with a Lieutenant" in which another member of the prison staff explained why Danial was being moved to the padded cell.

occasions and only when there is a potential emergency. In response, Earls responded, "let sleeping dogs lie" and did not open the cell.

Earls argues these circumstances are insufficient to show he had knowledge of a substantial risk of serious harm to Danial. Earls relies primarily on his stated belief that Danial was simply sleeping. Earls points to a plethora of evidence that could be used to find Earls was unaware of Danial's needs. But we do not weigh evidence on appeal, Jones, 746 F.3d at 895, and the facts recited above allow a factfinder to infer that Earls was aware of a substantial risk of serious harm. A jury could find that Earls acted inappropriately in light of the risk, and a jury could find Earls recognized the inappropriateness of his complete failure to act. See Krout, 583 F.3d at 567. The district court appropriately denied Earls qualified immunity.

### C. Jennings

Jennings argues she did not know that Danial was in medical distress but even if she did know, she was not deliberately indifferent to the risk of harm. Unlike Farnsworth and Earls, Jennings argues that once she learned of potential harm to Danial, she did not completely disregard the harm.

Again, the discussion must begin with the relevant facts surrounding Jennings's involvement. Jennings was not in charge of medical checks or custody checks—she was in charge only of classification. She knew that Danial had previously been banging his head in his concrete cell. When she viewed Danial on a monitor at 2:00 p.m., she went to his cell. She spoke with Gastineau at Danial's cell. Gastineau told Jennings that Danial had not moved for six hours and had refused two meals. Gastineau continued, however, by telling Jennings that a nurse said Danial was okay so long as he was still breathing. Jennings also wanted the cell open but was told by Gastineau that no custody staff would do so. Jennings knew that she had the ability to call a "Code 16," but she also knew a Code 16 would have medical staff take

- 12 -

over—the same medical staff that Gastineau claimed had stated Danial was fine so long as he was breathing. After leaving Danial's cell, she attempted to call a number of supervisors to determine how to proceed.

Jennings contends she had no actual knowledge of a substantial risk of serious harm. Like Farnsworth, Jennings relies on Krout to support her argument. Krout held prison employees were entitled to qualified immunity, in part because they reasonably relied on a medical employee's statements minimizing an injured party's risk of further injury. 583 F.3d at 568–69. Unlike Farnsworth, Jennings actually learned of Nurse Hook's views regarding Danial. The district court nevertheless concluded Jennings could not protect herself from liability because any reliance on Nurse Hook's statements was unreasonable. See McRaven v. Sanders, 577 F.3d 974, 981 (8th Cir. 2009) (explaining that prison employees are protected when relying on advice from medical professionals only if such reliance is reasonable). The district court found that because Danial was laying in his cell without moving, "Danial's need to be checked by medical personnel was obvious even to a lay person." It further explained that the nurse's advice was "so obviously deficient even to a lay person" that Jennings acted "unreasonably" by not confirming that medical personnel had, in fact, made the statement.

Even assuming Jennings's reliance on Nurse Hook's statements was unreasonable, Jennings argues she did not act with deliberate indifference to Danial's needs. We must look at Jennings's actions "in light of the information [s]he possessed at the time, the practical limitations of [her] position and alternative courses of action that would have been apparent." Gregoire, 236 F.3d at 419. To succeed on the second element of deliberate indifference, Jennings had to "deliberately disregard" Danial's needs. Krout, 583 F.3d at 567. The district court held that Jennings "delayed taking reasonable measures to permit the door to be opened" because she did not call a Code 16. The failure to call a Code 16 in these circumstances, however, does not demonstrate deliberate indifference. Jennings knew that a Code 16 would simply

- 13 -

transfer control of the cell to medical personnel—the same medical personnel who, by Jennings's estimate, stated Danial was fine so long as he was breathing. Instead, Jennings took other steps to abate Danial's risk of injury. Jennings began making phone calls to supervisors to determine how to proceed. While Jennings could have acted differently in the situation and while her actions may even be considered negligent under the circumstances, her conduct does not constitute "deliberate indifference" as a matter of law. See Jackson, 140 F.3d at 1152 ("[M]ere negligence does not support a conclusion that [defendant] exercised a callous disregard or reckless indifference in responding to the risk." (internal quotation marks omitted)). Jennings is therefore entitled to qualified immunity.

III

Because the evidence in the summary judgment record demonstrates that a jury could find Farnsworth and Earls liable for deliberate indifference, we affirm the district court's denial of summary judgment in part. But because Jennings's conduct constitutes, at most, negligence, we reverse the denial of summary judgment and instruct the district court to enter judgment in Jennings's favor on the deliberate indifference claim.

_____