United States Court of Appeals
For the Eighth Circuit
No. 25-1187

Ronald J. Hamilton, Jr.

*Plaintiff - Appellant*

v.

Superintendent DeAngelo Earl, Ouachita River Correctional Unit ("ORCU");
Todd Ball, Deputy Warden ORCU; Bryant Dallas, Shift Captain ORCU

*Defendants - Appellees*

——————————

Appeal from United States District Court
for the Western District of Arkansas - Ft. Smith

——————————

Submitted: January 13, 2026
Filed: February 17, 2026

——————————

Before LOKEN, ARNOLD, and GRUENDER, Circuit Judges.

——————————

ARNOLD, Circuit Judge.

While incarcerated in an Arkansas prison, Ronald Hamilton, Jr., spent about six weeks in isolation without air conditioning in the middle of summer. Hamilton maintains that his stint in isolation amounted to cruel and unusual punishment under the Eighth and Fourteenth Amendments because prison officials knew that he, as a dialysis patient, shouldn't be exposed to excessive heat, yet they did not move him

to a cell with air conditioning. The district court[1] granted summary judgment to the prison officials, holding that they were entitled to qualified immunity, and Hamilton appeals. Reviewing the court's grant of summary judgment de novo, and viewing the evidence in a light most favorable to Hamilton, *see De Rossitte v. Correct Care Sols., LLC*, 22 F.4th 796, 802 (8th Cir. 2022), we affirm.

Hamilton was imprisoned in the Ouachita River Unit of the Arkansas Department of Corrections. One July day Hamilton got into a physical altercation with a prison guard. After he was evaluated by the prison's medical staff, prison officials moved him from an air conditioned cell in the Special Needs Unit to a cell in an isolation unit that lacked air conditioning. Though we don't know the precise temperature inside Hamilton's cell, he says, without showing how he knew, that the temperature was just as hot as the outside temperature, which during the relevant time rose as high as 95 degrees Fahrenheit according to the historical records Hamilton offers.

Hamilton filed several grievances while housed in isolation. Among these was one filed four days after his placement there in which he asserted that he should be moved to the Special Needs Unit because he was on dialysis and had other health issues. Warden DeAngelo Earl denied the grievance, explaining that no documented medical restrictions prohibited him from being housed in isolation and that his previous disciplinary confinements in the Special Needs Unit were for convenience and not medical necessity.

Hamilton submitted a more elaborated grievance about four weeks into his time in isolation. In this one Hamilton explained that, though he had access to water, his dialysis regimen restricted him to drinking no more than a liter of fluid between

---

[1]The Honorable Susan O. Hickey, then Chief Judge, now United States District Judge for the Western District of Arkansas.

treatments. This restriction, he said, caused him physical discomfort: Because he perspired excessively in the summer heat, he could not replace the water his body needed to avoid painful cramping. He also stated that a dialysis nurse had told Captain Bryant Dallas about Hamilton's predicament. Earl denied this grievance as well, telling Hamilton that officials had contacted Dr. Thomas Daniel, a prison physician, about the situation, and Dr. Daniel had opined that moving Hamilton was not an emergency. Hamilton submitted another grievance a few days after this second one, insisting that the dialysis nurse manager and the health services administrator in the Special Needs Unit had informed Dallas in an email that he needed to move Hamilton for medical reasons. This grievance met the same fate as the others. In rejecting it, Earl noted that Deputy Warden Todd Ball had spoken to the health services administrator and others who said that there was no reason Hamilton couldn't be housed in isolation. So about a week later, Hamilton submitted a last grievance in which he asserted he had informed Ball directly about his plight but that Ball had done nothing about it. Earl denied this grievance as well for the same reason he denied the previous one. Five days after he filed that final grievance, Hamilton was transferred to the Special Needs Unit.

Hamilton sued Earl, Ball, and Dallas under 42 U.S.C. § 1983, claiming that they had subjected him to cruel and unusual punishment, causing him nerve damage and later the loss of his kidneys. After the parties completed discovery, the defendants moved for summary judgment, and a magistrate judge recommended that the district court deny the motion. The district court, however, declined to adopt the magistrate judge's recommendation and instead granted the defendants summary judgment on the ground that they were entitled to qualified immunity. Hamilton moved unsuccessfully for the court to reconsider its decision.

Qualified immunity "shields government officials from liability when their conduct does not violate clearly established constitutional rights of which a reasonable person would have known." *See Joseph v. Wheeler*, 144 F.4th 1111, 1113

(8th Cir. 2025). To determine whether the defendants are entitled to qualified immunity, we ask whether they violated a constitutional right and whether that right was clearly established. *See Melton v. City of Forrest City*, 147 F.4th 896, 901–02 (8th Cir. 2025). If the answer to either question is no, the defendants are entitled to qualified immunity. *See McDaniel v. Neal*, 44 F.4th 1085, 1089 (8th Cir. 2022).

In considering whether the defendants violated Hamilton's constitutional right to be free of cruel and unusual punishment, we note at the outset that while the Eighth and Fourteenth Amendments don't mandate comfortable prisons, they do prohibit inhumane ones; and prison officials must ensure that inmates "receive adequate food, clothing, shelter, and medical care." *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Since the constitution protects against cruel and unusual "punishments," and not cruel and unusual "conditions," *see id.* at 837, it protects prisoners only against "unnecessary and wanton infliction of pain," which the Supreme Court has said results from, at a minimum, prison officials' deliberate indifference. *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991).

As the district court observed in its summary-judgment order, Hamilton's complaint lacks a certain clarity. He might be challenging the conditions of his confinement, the unconstitutional denial of medical care, or both. After all, the medical care an inmate receives is as much of a condition of confinement as "the temperature he is subjected to in his cell." *See id.* at 303. But whatever category Hamilton's claim most comfortably belongs in, to prevail he must show that his predicament was sufficiently serious: He must show that he was incarcerated in conditions that posed an objectively substantial risk of serious harm, *see Kulkay v. Roy*, 847 F.3d 637, 642 (8th Cir. 2017), or that he suffered from an objectively serious medical need. *See Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011). The parties dispute whether Hamilton has carried this burden at this stage of the case, but we will assume that it is objectively serious for a person with a kidney disease requiring dialysis to be housed in high temperatures for six weeks given that he is on

-4-

a fluid restriction. Or stated another way, we will assume that air conditioning was an objectively serious medical need for someone in Hamilton's circumstances.

To succeed on his claim, though, Hamilton must also demonstrate that the defendants acted, at a minimum, with deliberate indifference toward him. *See Wilson*, 501 U.S. at 297. Deliberate indifference is more than mere negligence or the ordinary lack of due care for a prisoner's safety. *See Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015). It is more even than gross negligence. *See Kulkay*, 847 F.3d at 643. Liability requires a showing that the defendants acted with a highly culpable state of mind that resembles criminal-law recklessness and approaches actual intent. *See id.* The evidence must demonstrate that officers understood that a substantial risk of harm or medical need existed and that they knew their conduct was inappropriate in light of that risk or need. *See Letterman*, 789 F.3d at 862.

Even if the three defendants had known, from Hamilton's grievances or otherwise, that a substantial risk of harm or a serious medical need existed, the record lacks sufficient evidence to support a finding that they responded to the risk or need inappropriately, much less that they knew they had responded inappropriately. First, Hamilton did not have a documented medical restriction directing that he should not be exposed to high temperatures. He had such a restriction at one time, but it ended in 2018 because, according to a note accompanying that restriction's termination, he "is now on dialysis—not on medication that would make him sensitive to heat." It's therefore difficult to fault the defendants for concluding that Hamilton could be housed in a cell without air conditioning.

Hamilton attempts to set up Earl's own words against him, emphasizing that a year before he was in isolation Earl wrote in response to an unrelated grievance that Hamilton was placed in the Special Needs Unit rather than isolation "[d]ue to [Hamilton's] medical status." But Earl did not say that Hamilton's medical status required that he be placed in the Special Needs Unit. In fact, when Hamilton appealed Earl's decision regarding that grievance, the prison official who responded explained

that Hamilton was assigned to the Special Needs Unit "instead of isolation due to your medical needs, which could be addressed easier in" the Special Needs Unit given the location where Hamilton received dialysis treatments. As Earl himself would later put it, Hamilton's medical status merely made the Special Needs Unit more convenient than isolation. And though Hamilton presented evidence that at different times a few other inmates on dialysis were sent to the Special Needs Unit when being punished, that doesn't mean medical necessity, as opposed to convenience, was the reason. So given the context, we do not think Earl's remark a year earlier advances Hamilton's claim.

In addition, rather than rely on their own assessment of Hamilton's medical predicament, jail officials sent a copy of Hamilton's grievance in which he discussed his fluid-intake restriction to Dr. Daniel for his opinion, and Dr. Daniel responded that moving Hamilton was not "an emergency move." Hamilton's medical records also reflect that Dr. Daniel saw Hamilton the same day. Though Dr. Daniel acknowledged that Hamilton "would be better served" in the Special Needs Unit, he explained that was because the heat might cause dermatitis to "compromise his fistula." Most notably, Dr. Daniel didn't express any concern about dehydration despite receiving Hamilton's specific complaints about it. The defendants, lacking medical expertise, cannot be said to have been deliberately indifferent when they sought and received a doctor's guidance and then didn't act in any way contrary to it. *See Reece v. Hale*, 58 F.4th 1027, 1033 (8th Cir. 2023). And even though Hamilton questions Dr. Daniel's judgment, nothing in the record suggests that the defendants should have done so. *Cf. id.* (discussing *McRaven v. Sanders*, 577 F.3d 974 (8th Cir. 2009)).

Hamilton testified that two dialysis nurses told Dallas that Hamilton needed to be moved from isolation to the Special Needs Unit but that he heard Dallas tell them "to mind their own business." The defendants say that we should disregard Dallas's alleged conversation with the nurses as hearsay. Dallas's statement is not hearsay, but in any case it doesn't reflect deliberate indifference on Dallas's part in this context.

As we said, prison officials contacted a doctor about Hamilton's complaints who advised, after examining Hamilton, that there was no emergency. The defendants simply aren't deliberately indifferent for taking the doctor at his word, even if medical personnel who were not physicians had a different opinion.

Still other circumstances evidence a lack of deliberate indifference. While in isolation, Hamilton occasionally complained about physical ailments, and it appears that his complaints were promptly addressed. For example, Hamilton complained more than once about rashes, and he was prescribed different treatments on the very days in which he complained. He also admitted that he didn't miss a dialysis treatment, which he received three times per week. In sum, Hamilton wasn't thrown in isolation and forgotten about; he was monitored and was responded to when he had medical needs and voiced physical discomfort. *See De Rossitte*, 22 F.4th at 803.

Finally, we observe that the prison implemented measures to mitigate the effects of the summer heat. Prison officials installed and ran portable air conditioners in the isolation units. They also kept doors open to the main hall that was air conditioned so that cool air could circulate into the isolation units. Hamilton disputes that these measures were effective in lowering the temperature. But he doesn't dispute that prison officials undertook them or argue that they knew or even suspected that they would be futile. Genuine attempts to mitigate Hamilton's difficulties, even if ineffective, suggest that prison officials were not deliberately indifferent to Hamilton's situation.

For all these reasons, we conclude that the record does not support a finding that the defendants were deliberately indifferent to Hamilton's serious medical needs. Because Hamilton's cruel-and-unusual-punishment claim therefore fails, we agree with the district court's decision to grant the defendants summary judgment.

Affirmed.

———————————————————